CONSOLIDATED PAPER CO. v. UNITED STATES.

No. L–477.

Court of Claims.
May 31, 1932.

Plaintiff sues to recover $103,347.78 with interest from March 15, 1921, income and profits tax for 1920 alleged to have been illegally collected by credit on October 31, 1927, of overpayments for 1917 to 1919, inclusive, after the expiration of the period of limitation within which collection of the 1920 tax could lawfully be made. It is not disputed that the tax due for 1920 was first satisfied by a lawful credit of overpayments for prior years duly allowed within the period of limitation provided by law, within which the 1920 tax could be collected.

The plaintiff contends, however, that the credit which had been timely allowed and taken against the 1920 tax was canceled by the Commissioner, and that, when he thereafter signed a supplemental schedule of refunds and credits on October 31, 1927, he finally allowed credit, at which time the collection of the 1920 tax was barred.

The question presented is whether the amount of the aforementioned overpayments was credited against the tax for 1920 within the period of limitation within which the 1920 tax could be collected. The actions of the Commissioner with respect to such credit will be hereinafter more fully stated.

The defendant insists, first, that the plaintiff, whose organization resulted from a consolidation of two other corporations, is not the real party in interest with respect to the claim here involved; that, if it received such claim upon its organization, through the consolidation of the two other corporations and the acquisition of their assets and liabilities, there was an assignment of the claim within the meaning of section 3477 of the Revised Statutes (31 USCA § 203), which was void in so far as concerned the right of the plaintiff to maintain suit thereon against the United States; and, secondly, that the collection of the 1920 tax by credit was made within the statutory period of limitation for the reason that under section 1116(b) of the Revenue Act of 1926 (26 USCA § 153 note) the credit was allowed and taken on September 20, 1926, when the Commissioner signed the schedule of overassessments. The defendant further insists that the Commissioner's determination on May 12, 1926, of a deficiency for 1920 and the mailing to the plaintiff

of a notice thereof by registered mail under the provisions of section 274(a) of the Revenue Act of 1926 (26 USCA § 1048), operated to suspend the running of the statute of limitation for a certain period of time, with the result that the statutory period of limitation for the collection of the 1920 tax by credit, or otherwise, did not expire until November 4, 1927; and that under the theory of the plaintiff that the credit was not finally allowed and taken until the Commissioner signed a second or supplemental "schedule of refunds and credits" on October 31, 1927, the 1920 tax was collected in time.

### Special Findings of Fact.

1. Plaintiff, a Michigan corporation, was organized under the laws of that state in May, 1921, by the consolidation of the Boehme & Rauch Company and the Monroe Binder Board Company, both Michigan corporations, and succeeded to the assets and liabilities of the corporations mentioned under the laws of Michigan and the terms of the two written agreements executed by the consolidating corporations.

2. The said consolidation was effected pursuant to the terms of the two written agreements executed by the consolidating companies February 15 and April 30, 1921, respectively. In the agreement of the first date, which is in evidence as Plaintiff's Exhibit 1, and is made a part of this finding by reference, it was provided, among other things, that:

(a) A new corporation, i. e., the plaintiff, would be formed, that the stock of both consolidating companies would be transferred to it; and that "the properties, both real and personal, and all assets, both fixed and quick, of each company shall be assigned" to the new company.

(b) That the common and preferred stock of the new company would be issued in exchange for the stock of the old companies upon a basis to be agreed upon by the board of directors of the two companies, but that the amount of common stock issued would be equally divided between the two consolidating companies on the basis of their respective fixed assets, it having been agreed that the fixed assets of both companies were of equal value.

(c) That the preferred stock of the Consolidated Paper Company would be issued on the basis of the respective quick assets of the consolidating companies, i. e., that whichever company owned the greater amount of quick assets would receive preferred stock in an amount equal to such excess.

(d) That an inventory of all quick assets of both companies would be taken for the purpose of determining the basis for issuing said preferred stock.

(e) That all accounts receivable included in the inventory of quick assets would be guaranteed by the company receiving credit therefor in said inventories, and in the event of a failure to collect any of said accounts the loss would be chargeable to the company receiving credit therefor.

This agreement further provided that:

(1) "In the inventory of assets and liabilities it is understood and agreed that the Boehme and Rauch Company are now prosecuting a claim against L. S. Lorimer Sons and the M. A. Hanna Company. These claims shall not be inventoried, and the avails, if any, are to be the property of the said Boehme and Rauch Company."

(2) "It is understood and agreed that in any suits now pending, or hereafter brought, against either of the parties hereto and judgments rendered, or cost and expenses made, are liabilities of each company, separately, and said liability to be paid by each company so chargeable, or by their stockholders. If paid by the new company, to be organized, to be charged to the stockholders of original company having said liability."

(3) "It is understood and agreed that income taxes assessed against either of the parties hereto, either for the year 1920 or any preceding year, are to be paid by the respective companies so chargeable, or assessed against their stockholders by the new company to be organized."

(4) "Upon the completion of inventory of each company, a committee * * * shall check over the assets of each company and from this amount will be deducted all accounts payable, including taxes and other liabilities of each company, and the net total thus remaining will be the net quick assets upon which true values will be arrived at and the provisions of this arrangement made effective."

3. By the supplemental agreement of April 30, 1921, which is in evidence as Plaintiff's Exhibit 2, and made a part of this finding by reference, it was further provided that the inventories above mentioned should exclude a contract between the Monroe Binder Board Company and the American Straw Board Company, and that

(1) "Any liability or damage arising therefrom, as well as any profit that may accrue by reason of said contract, shall be the

property of the stockholders of the Monroe Binder Board Company and shall not be considered as a liability of the new company in any way."

(2) It was further provided in said supplemental agreement that:

"Third. That the Boehme & Rauch Company are owners of stock and bonds in the H-O Company amounting to approximately twelve thousand five hundred ($12,500) dollars; that The Monroe Binder Board Company is the owner of stock in the American Paper Exports Company amounting to one thousand ($1,000) dollars and in the Como Chemical Company amounting to ten thousand ($10,000) dollars; that these stocks shall be listed at par on the books of the respective companies as accounts receivable and shall be considered as assets; that the Consolidated Paper Company shall take these stocks over as assets at their par value, but that same shall be liquidated and disposed of on or before May 1, 1922, and in the event of gain or loss by reason of such sale, such gain or loss shall be debited or credited to the stockholders of the company owning same, as soon as such gain or loss shall be determined under the provisions of article five, section three of the by-laws of the Consolidated Paper Company."

(3) "Sixth. In the consolidation of the Monroe Binder Board Company and the Boehme & Rauch Company, heretofore referred to, there appeared in the inventory of *deferred assets* an item of twenty-nine thousand eight hundred three dollars eighty-seven cents ($29,803.87). This item was stricken from the inventory, but will be set up upon the books of the Consolidated Paper Company as a *deferred asset*. Under the Federal statutes relating to income taxes, a certain portion of this *deferred assets* is considered as an item of expense, and is chargeable against taxes to be paid the Federal Government.

"It is hereby agreed that any saving made by the Consolidated Paper Company by reason of the charging of any portion of the said *deferred assets* as an expense in the making up of Federal income-tax returns, shall be credited to the account of the stockholders of the Monroe Binder Board Company, and the saving so made shall be paid to the said stockholders as they may direct."

4. Pursuant to said agreements, the stockholders of the Rauch Company and the Binder Board Company assigned to the plaintiff all of their respective stock in the said two companies, the stockholders of the Rauch Company receiving in exchange therefor a total of $2,500,000 par value of plaintiff's common stock and $1,700,000 par value of its preferred stock, and the stockholders of the Binder Board Company receiving $2,500,-000 par value of plaintiff's common stock. The preferred stock in the amount above indicated was issued to the stockholders of the Rauch Company pursuant to the terms of the foregoing agreements, the amount thereof having been determined by reference to the inventories of quick assets of both companies above referred to.

5. Certain assets having been eliminated from said inventories and said inventories also containing certain assets which might later prove to be worth less than their agreed values at the time of the consolidation, the following provision was adopted in the by-laws of the plaintiff company and indorsed upon each certificate of its common stock, such indorsement still appearing on each such certificate now outstanding:

"This stock is issued in the consolidation of the Boehme & Rauch Company and the Monroe Binder Board Company and if any assets of the company for which this stock is exchanged, which were not listed as assets in such consolidation, are hereafter received by this company, such assets will be distributed solely among the holders of the common stock issued in exchange for stock of the company owning such asset, and this stock is entitled to a pro rata share thereof and the dividends on this stock are subject to a lien in favor of this company for a pro rata share of any liabilities of the company for which its stock was exchanged, which were not listed as liabilities in such consolidation, and for the amount of any accounts receivable, listed as good but not collected, and this company has the right to withhold dividends hereon and apply them to such liabilities until the prorata share of this stock thereon is fully discharged.

"This stock is issued in exchange for stock of ——— Company."

6. Thereafter the assets of the Rauch Company and the Binder Board Company, including all of the accounts receivable of both companies, were transferred to the plaintiff, and it assumed all of the liabilities of both companies. The Rauch Company was dissolved June 27, 1921.

7. Thereafter the plaintiff collected from time to time the proceeds of certain claims and accounts of both the Rauch Company and the Binder Board Company which had not been included in the computation of in-

ventories above mentioned. The plaintiff also from time to time thereafter paid out various amounts of money in settlement of liabilities of both the Rauch Company and the Binder Board Company as to which it was entitled to reimbursement from the old stockholders of the respective companies. Among such liabilities paid by plaintiff were federal income and profits taxes due by the Boehme & Rauch Company in the amount of $112,000 for accounting periods prior to May 2, 1921, and also federal income and profits taxes due by Monroe Binder Board Company for similar periods aggregating approximately $100,000. All such items were carried on the books of the plaintiff in separate accounts, one for the Rauch Company and one for the Binder Board Company.

8. In order to make a final accounting and settlement of the items mentioned in the last preceding paragraph, in accordance with the provisions of the consolidation agreements above referred to, the plaintiff set up on its books so-called contingent accounts for the Rauch Company and the Binder Board Company. These accounts were credited or debited as and when the plaintiff received or paid out any items referred to in paragraph 7 hereof. All moneys collected went into and remained in the treasury of the plaintiff. At the time of taking testimony in this case these two contingent accounts were almost equal. The proceeds, if any, of the refund claim here in suit will be credited to the so-called Boehme & Rauch contingent account.

9. When all of the items referred to in paragraph 7 have been finally settled, the plaintiff will make a settlement with its stockholders in the following manner:

If the contingent accounts of both old companies show credit balances, the excess of the larger credit balance over the smaller credit balance will be distributed pro rata among the holders of plaintiff's common stock received in exchange for stock of the old company having the larger credit balance. If the contingent accounts of both old companies show debit balances, the excess of the larger debit balance over the smaller debit balance will be assessed pro rata among the holders of plaintiff's common stock received in exchange for stock of the old company having the larger debit balance.

10. The ultimate beneficiaries of a recovery in this proceeding will be the stockholders of the plaintiff who own common stock of the plaintiff company issued in exchange for common stock of the Rauch Company.

The present owners of such stock are identical with the owners of the old stock of the Rauch Company, except that as to those original owners who have died since the date of consolidation, their stock being now owned by their respective heirs.

11. Section 5, subdivision 2, of chapter 3, part 1 of Act No. 84 of the Public Acts of the state of Michigan for the year 1921, as amended, provides as follows: "The consolidated corporation so formed shall hold and enjoy all the powers, privileges, rights, franchises, properties, claims, demands and estates, which at the time of such union may be held and enjoyed by either of the said constituent corporations and be subject to all the dues, demands, contracts, and liabilities existing against either of the same; and all suits at law or in equity, and all proceedings which may be pending, to which either corporation shall be a party, may be prosecuted and defended by the consolidated corporation in the same name, in like manner, and with the same effect as might have been done had such union not have been formed. All claims, contracts, rights, and causes of action of or against either of such constituent corporations, at law or in equity, may be enforced by suit or action, to be commenced and prosecuted by or against the consolidated corporation, and the said constituent corporations shall continue as corporations for the purpose of prosecuting and defending any suits or proceedings pending at the time of such consolidation."

12. March 30, 1918, Boehme & Rauch Company filed its income and profits tax returns for the calendar year 1917 disclosing a total tax liability of $183,477.23, which was voluntarily paid on that date. Thereafter, on October 5, 1918, it filed amended income and profits tax returns for 1917 showing a total tax liability for the year of $313,476.20. The Commissioner of Internal Revenue made an examination and audit of the returns and the books and records of the Rauch Company and determined an additional tax of $128,837.79 for 1917, which tax was duly assessed on the October, 1919, list. It was voluntarily paid by the Boehme & Rauch Company November 29, 1919.

13. June 12, 1919, the Boehme & Rauch Company filed its income and profits tax return for the calendar year 1918 showing a total tax of $384,807.43, which was voluntarily paid by that company in four installments of $110,000 on March 15, 1919, $82,403.73 on June 12, 1919, and $96,201.85 each on September 2 and December 17, 1919.

Thereafter, on November 16, 1921, the Boehme & Rauch Company filed an amended return for 1918 disclosing a total tax for the year of $369,133.06. This amount was less than the amount shown, assessed, and paid on the original return, and no assessment or payment was made on the amended return. The Commissioner made an examination and audit of the returns and the books of Boehme & Rauch Company and determined an additional tax of $33,915.55, and a penalty of $1,695.78 for 1918, which tax and penalty were assessed in January, 1921. This additional assessment was satisfied as follows: March 10, 1921, paid $27,490.32; January, 1921, overassessment, 1919, credited, $7,016.-05; October 4, 1926, abated, schedule IT: A—22226, $1,104.96; total tax and penalty, $35,611.33.

14. April 22, 1920, the Boehme & Rauch Company filed its return for the calendar year 1919 showing a total tax of $351,895.74, which tax was voluntarily paid in four installments of $89,000 on March 15, 1920, $87,-631.91 each on June 15 and September 15, 1920, and $87,631.92 on December 15, 1920.

Thereafter, November 16, 1921, the Boehme & Rauch Company filed an amended return for 1919 showing a total tax for the year of $299,331.34. The Commissioner made an examination and audit of the return and the books of the companies and determined an overpayment of $7,016.05, which amount was credited January 29, 1921, against a portion of the additional tax assessed for the calendar year 1918.

15. April 6, 1921, the Boehme & Rauch Company filed its tax return for the calendar year 1920 showing a total income and profits tax of $114,753.38. This tax was assessed August 13, 1921. At the time the return for 1920 was made and at the time the tax shown to be due thereon was assessed, as aforesaid, this company had filed claims for credits and refunds for the years 1917, 1918, and 1919 at various dates and in various amounts based upon claimed adjustments to income and invested capital. It had also filed an application to have its profits tax for 1917 to 1920, inclusive, determined and computed under the relief provisions of section 210 of the Revenue Act of 1917 (40 Stat. 307), and sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093). These claims were pending before the Commissioner at the time and had not been adjudicated.

November 16, 1921, the Boehme & Rauch Company filed an amended return for 1920 disclosing a total tax of $147,996.19, which

was $33,242.81 in excess of the amount shown to be due and assessed on the original return. The additional tax of $33,242.81 shown to be due on the amended return was assessed January 26, 1922; $103,347.78 of the total tax returned and assessed for 1920 was collected and paid by the credit of overpayments totaling that amount for the years 1914 to 1919, inclusive, entered on schedules of overassessments and of refunds and credits, No. IT:R–22226; and the balance of $44,648.-41 was paid in cash October 25, 1926, by the plaintiff.

The overpayments credited against the 1920 tax were as follows:

| | |
|---|---|
| 1914 | $74.03 |
| 1915 | 20.09 |
| 1916 | 104.02 |
| 1917 | 48,304.42 |
| 1918 | 10,939.75 |
| 1919 | 43,905.47 |
| | 103,347.78 |
| October 25, 1926, cash | 44,648.41 |
| | 147,996.19 |

16. March 30, 1926, the Boehme & Rauch Company executed a written consent waiving "the time prescribed by law for making any assessment of the amount of income, excess-profits, or war-profits taxes due under any return made by or on behalf of said taxpayer for the year (or years) 1920 under existing revenue acts, or under prior revenue acts.

"This waiver of the time for making any assessment as aforesaid shall remain in effect until December 31, 1926, and shall then expire except that if a notice of a deficiency in tax is sent to said taxpayer by registered mail before said date and (1) no appeal is filed therefrom with the United States Board of Tax Appeals then said date shall be extended sixty days, or (2) if an appeal is filed with said board then said date shall be extended by the number of days between the date of mailing of said notice of deficiency and the date of final decision by said board."

17. The Commissioner made an examination and audit of the returns, the books of account, and the records of the Boehme & Rauch Company for 1917 to 1920, inclusive, in connection with said claims for credit and refund and application for computation of its profits tax under the relief provisions of the Revenue Acts of 1917 and 1918. The application for relief was allowed for 1917, 1919, and 1920, and the profits tax for those years was computed under the provisions of the relief sections. The application for relief was denied for the year 1918 for the reason

that no gross disproportion for that year was disclosed between the tax computed without the benefit of section 328 and the tax computed by reference to representative concerns specified in that section.

May 12, 1926, the Commissioner mailed to the Boehme & Rauch Company a sixty-day notice of his determination for the years 1917 to 1920, inclusive, showing overassessments of $48,304.42, $12,044.71, and $43,905.47 for 1917, 1918, and 1919, respectively, and a deficiency in tax of $13,820.06 for 1920.

June 3, 1926, the "Consolidated Paper Company, successor to Boehme and Rauch Company," the plaintiff herein, duly executed and filed a waiver of the right to file a petition with the United States Board of Tax Appeals with respect to the year 1920. This deficiency for 1920 was duly assessed and was paid by plaintiff October 29, 1926.

18. On September 20, 1926, the Commissioner signed and approved Schedule No. 22226, form 7805, being a "Schedule of Overassessments" for the First District of Michigan. This schedule showed overassessments of tax and penalty in favor of Boehme & Rauch Company for 1914 to 1919, inclusive, in the total amount of $104,452.74. On this schedule of overassessments the Commissioner instructed the collector that "if any part of any such item is found to be an overpayment, you will examine all accounts of the taxpayer for other periods and apply the overpayment as a credit against the taxes due, if any, making the appropriate entries in your accounts. * * * Such credits will be entered in column 9 and placed in column 5 of a subsidiary schedule of refunds and credits (form 7805–A)." This schedule of overassessments is in evidence as Exhibit D to the stipulation of facts and is made a part hereof by reference. It was the only schedule of overassessments prepared and signed by the Commissioner of Internal Revenue relative to the overassessments in respect of the tax of Boehme & Rauch Company for 1914 to 1919, inclusive, and no change or erasure of any statement or entries appearing thereon was ever made. Upon receipt of the schedule of overassessments, the collector, pursuant to instructions thereon, examined his records and made appropriate entries in columns 7 to 13, inclusive. The amount of $103,347.78 of the total overassessments was shown to be overpayments and was entered as a credit under column 9 against that amount of tax due for 1920; $1,104.96, being the unpaid portion of the penalty assessed for 1918, was abated. After making these entries the collector, on October 1, 1926, signed the "certificate of collector" and returned the schedule of overassessments so filled out to the Commissioner of Internal Revenue.

At the same time the collector, pursuant to his instructions, prepared and made appropriate entries in the "Schedule of refunds and credits," form 7805–A, and signed the "certificate of collector" thereon. This schedule of refunds and credits was forwarded to the Commissioner with the schedule of overassessments. The schedule of refunds and credits prepared, signed, and forwarded by the collector to the Commissioner is in evidence as Exhibit E to the stipulation and is made a part hereof by reference. The schedule of refunds and credits and the items appearing thereon were checked by the Deputy Commissioner who found them to be correct and said schedule was certified to the Commissioner October 12, 1926. On the same day, to wit, October 12, 1926, the Commissioner of Internal Revenue approved the schedule of refunds and credits and signed the "Authorization of commissioner to the disbursing clerk, Treasury Department," appearing on said schedule, Form 7805–A.

Interest in the amount of $6,460.36 allowed by section 1116 of the Revenue Act of 1926 (26 USCA § 153 note) on the overpayments for prior years credited against the tax due for 1920 from the dates of the overpayment to the due date of the 1920 tax was found to be payable. Pursuant to the usual practice the schedule of refunds and credits which had been signed and approved by the Commissioner was, on November 13, 1926, forwarded to the General Accounting Office for check to ascertain whether or not the taxpayer was otherwise indebted to the United States. The funds under the appropriation for "1927 and prior years," from which all refunds and interest were payable, had been temporarily exhausted November 4, 1926. The "Schedule of refunds and credits" was therefore returned by the General Accounting Office to, and was retained by, the accounts and collection unit of the Bureau of Internal Revenue to be held until such time as funds should become available, as on former occasions. Funds from which the item of interest could be paid under the appropriation for "1928 and prior years" were in the hands of the disbursing clerk of the Treasury Department on March 3, 1927. In the meantime, however, the Act of February 28, 1927, H. R. 16462, being the first deficiency act for the fiscal year 1927, 44 Stat. 1250, became effective. And, in the provision thereof making an appropriation for the refunding of taxes illegally collected for 1928 and prior

years, there was enacted a proviso "That no part of this appropriation shall be available for paying any claim allowed in excess of $75,000 until after the expiration of sixty days from the date upon which a report giving the name of the person to whom the refund is to be made, the amount of the refund, and a summary of the facts and the decision of the Commissioner of Internal Revenue is submitted to the Joint Committee on Internal Revenue Taxation." 44 Stat. 1254, § 1. Because of the enactment of this provision, the entries which had been made by the collector on the schedule of refunds and credits, Form 7805-A, which schedule had been signed by the Deputy Commissioner and by the Commissioner on October 12, 1926, as aforesaid, were crossed out with pen and ink and a notation "Re-amendment" was made opposite each entry through which a line had been drawn.

The certificates of the collector and the Deputy Commissioner and the authorization and approval of the Commissioner on said schedules of refunds and credits remained as made.

19. On or prior to September 1, 1927, the Commissioner transmitted a report to the Congressional Joint Committee on Internal Revenue Taxation of his allowance of the credit of overpayment for 1914 to 1919, inclusive, for which claims had been duly filed against the tax for 1920. On October 31, 1927, the period of sixty days having expired, the overassessments theretofore scheduled by the Commissioner, and entered and certified by the collector on the schedule of refunds and credits above mentioned as overpayments and credited against the tax due for 1920, and interest of $6,460.36 payable on the overpayments, were entered on a "supplemental schedule, Form 7805-A, IT: R: 22226." The following statement was typed on the schedule at the time of its preparation: "The following items were deleted from the original schedule pursuant to the Act of February 28, 1927, H. R. 16462, and are relisted hereon for payment, the required notice to the Joint Committee on Taxation having been given on September 1, 1927." This supplemental schedule was certified to the Commissioner by the Deputy Commissioner October 31, 1927, and, on the same day, the Commissioner signed the "Authorization of the commissioner to the disbursing clerk, Treasury Department," appearing thereon. This schedule was transmitted to the disbursing clerk and thereafter check was issued for interest of $6,460.36 on the overpayments credited, being

the interest due under the provisions of section 1116 (a) of the Revenue Act of 1926 (26 USCA § 153 note) from the dates on which the overpayments for 1914 to 1919, inclusive, had been made to March 15, 1921, the due date of the tax for 1920.

Certificates of overassessments for 1914 to 1919, inclusive, issued in the name of the Boehme & Rauch Company, were on November 29, 1927, mailed by the collector to that company, which had been theretofore dissolved, together with treasury check for the interest above mentioned. The certificates and check were received by plaintiff.

20. February 19, 1920, the Consolidated Paper Company, the plaintiff, as successor to Boehme & Rauch Company, filed with the Commissioner a claim for refund of $103,347.78, income and profits tax for 1920.

"In filing its original return for 1920 in March, 1921, the Boehme and Rauch Company showed a tax due of $114,753.38, claiming, however, that on account of overpayments for prior years, specifically set forth, it was entitled to a credit for the full amount of tax.

"Some time during the year 1926 the commissioner tentatively determined that overpayments for years prior to 1920 had been made to the extent of $103,347.78. In October, 1926, the collector of internal revenue at Detroit, Michigan, collected from the Boehme and Rauch Company the sum of $11,405.60 plus interest, representing the difference between the amount of tax shown on the return for that year and the credit for prior years of $103,347.78.

"However, this credit of $103,347.78 was not finally allowed by the Commissioner of Internal Revenue until October, 1927, at which time it was used finally to pay the balance of like amount of the tax existing for the year 1920.

"In other words, more than six years had elapsed from the date of the assessment of the balance of 1920 tax of $103,347.78 when the same was collected by the application of the credit aforesaid.

"Collection of this balance in October, 1927, was therefore barred by the statute of limitations and should be refunded."

This claim was disallowed by the Commissioner on a schedule of rejection of October 17, 1920, and the plaintiff was advised of this action by letter of that date.

Jesse I. Miller, of Washington, D. C., for plaintiff.

Charles B. Rugg, Asst. Atty. Gen. (Charles R. Pollard and H. C. Clark, both of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and LITTLETON, WHALEY, WILLIAMS, and GREEN, Judges.

LITTLETON, J.

■ Upon the facts in this case with reference to the organization of the plaintiff and the acquisition by it of the assets, through the consolidation of the Boehme & Rauch Company and the Monroe Binder Board Company, we are of opinion that the plaintiff is the proper party to prosecute this suit, and that the maintenance of the suit by the plaintiff is not prohibited by section 3477 of the Revised Statutes (31 USCA § 203). The facts show that the plaintiff acquired the assets and assumed the liabilities of the Rauch Company and the Binder Board Company, as the result of a consolidation. Although certain assets of the consolidated companies, including claims of the nature here involved, had been eliminated from the inventory values used as the basis for issuing preferred stock, the common stock of the plaintiff bore an indorsement to the effect that such assets, if and when realized, should be distributed solely among the holders of its common stock issued in exchange for stock of the company which had owned such assets. The common stock certificates of the plaintiff each bore an additional indorsement showing whether the same was issued in exchange for stock of the Rauch Company or the Binder Company. The plaintiff is therefore the owner of the claim, and, if there should be recovery, it will be credited to the so-called "Boehme and Rauch account," and, if there should eventually be a net credit in that account, the amount thereof will be disbursed as a special dividend to the then holders of the plaintiff's stock issued in exchange for the Boehme and Rauch stock. The right to participate in any recovery in this case depends therefore upon the ownership of the stock of the plaintiff and has no connection with the original owner of Boehme and Rauch stock, as such. We think this question is controlled by the decisions in Seaboard Air Line Railway v. United States, 256 U. S. 655, 41 S. Ct. 611, 65 L. Ed. 1149, and Kingan & Co., Inc., v. United States (Ct. Cl.) 44 F.(2d) 447.

■ The plaintiff contends with reference to the last question that the credit of overpayments for 1914 to 1919, inclusive, against the tax of $103,347.78 for 1920 was allowed by the Commissioner October 31, 1927, on which date the collection of the 1920 tax was barred; that the Commissioner's first allowance on October 12, 1926, was canceled, and was therefore void and of no effect as a collection of the 1920 tax.

The defendant insists that, since the credit in this case was allowed after the enactment of the Revenue Act of 1926, the signing of the schedule of overassessments on September 20, 1926, constituted the allowance of the credit within the meaning of section 1116 of the Revenue Act of 1926 (26 USCA § 153 note) rather than the signing of the schedule of refunds and credits, form 7805-A, and that, since none of the entries made on the schedule of overassessment on this form was erased or deleted, there is no merit in the claim of the plaintiff that there was no allowance of credit until the Commissioner signed a supplemental schedule of refunds and credits on October 31, 1927. The claim of the defendant is predicated upon the language of subdivision (b) (2) of section 1116 (26 USCA § 153 note), which provides that the term "date of the allowance of the refund" means, in any case, the first date on which the Commissioner signs the schedule of overassessments in respect thereof.

We are of opinion that the position taken by the defendant on this point is correct. Prior to the enactment of the Revenue Act of 1926 it was held in Girard Trust Co. v. United States, 270 U. S. 163, 46 S. Ct. 229, 70 L. Ed. 524, that a refund or credit was allowed when the Commissioner approved the schedule of refunds and credits prepared and forwarded to him by the collector of internal revenue after the collector had made appropriate entries in the schedules of overassessments theretofore signed by the Commissioner and transmitted to the collector. That case arose under section 1324 (a) of the Revenue Act of 1921 (42 Stat. 316), which provided that, upon the allowance of a claim for refund or credit, interest should be paid under certain circumstances. Section 1019 of the Revenue Act of 1924 (26 USCA § 153 note) provided that, upon the allowance of a refund or credit, interest should be paid thereon to the date of the allowance. Section 1116 of the Revenue Act of 1926, however, provided that upon the allowance of a credit or refund, interest should be paid in the case of a refund to the date of the allowance, and in the case of a credit to the due date of the amount against which the credit is taken, but, if the amount against which the

credit is taken is an additional assessment, then to the date of the additional assessment. The reason for making the change with reference to the payment of interest upon an overpayment credited against a tax due for another year and the allowance of interest on an overpayment to be refunded was that the taxpayer should receive interest on an overpayment only during the time that he was not indebted to the government for a like amount. Riverside & Dan River Cotton Mills v. United States, 37 F.(2d) 965, 69 Ct. Cl. 70. The language of section 1116 is that "upon the allowance of a credit or refund * * * interest shall be * * * paid on the amount of such credit or refund * * * from the date such tax * * * was paid to the *date of the allowance* of the refund, or in case of a credit, to the due date of the amount against which the credit is taken, but if the amount against which the credit is taken is an additional assessment, then to the date of the assessment of that amount."

Subdivision (b) (2) of this section (Revenue Act 1926, § 1116 [26 USCA § 153 note]) provides that "as used in this section * * * the term 'date of the allowance of the refund' means, in the case of any income, war-profits, or excess-profits tax, the first date on which the Commissioner signs the schedule of overassessments in respect thereof." Subdivision (c) of this section also provides that "This section shall be applicable to any refund paid, and to any credit taken, on or after February 26, 1926 [the date of the enactment of this act], even though such refund or credit was allowed prior to such date."

The plaintiff contends that the definition of the "date of the allowance of the refund" is specifically limited to that term as used in section 1116 for the purpose of determining the last interest date in the case of a refund, and that a different date is prescribed in the case of a credit; that the section plainly lays down a rule for the computation of interest and does not, in any sense, change the situation as to when a refund is allowed or a credit taken, as a matter of substantive law.

We think, however, that Congress intended by subdivision (b) (2) of section 1116 to fix the date of the allowance of an overpayment in the case of any income, war profits, or excess profits tax, whether the amount allowed was to be refunded or credited, and, in so doing, it definitely fixed the date of such allowance as the first date on which the Commissioner signs the schedule of over-

assessments in respect thereof. In defining the term "date of the allowance of the refund," Congress was construing the word *refund* in the broad sense of an overpayment rather than in the technical sense of a repayment to the taxpayer by check of an overpayment, where the taxpayer was not indebted for a tax for any other year, or the repayment by check of the excess of overpayment credited. This construction is supported by Report No. 52 of the Senate Committee on Finance, 69th Congress, 1st session, and Conference Report No. 356, page 56, 69th Congress, 1st session, in which it was stated that "In the case of *refunds,* interest is allowed 'to the date of the allowance of the refund.' In practice, the commissioner first signs a schedule of overassessments, which is sent to the collector *in order to determine whether the overpayment should be credited or refunded.* The committee amendment proposes to fix as the date on which a *refund* is allowed the date on which the commissioner signs the schedule of overassessments." (Italics supplied.)

The language of subdivision (a) of section 1116, considered as a whole, seems clearly to indicate that there should be no distinction between the date of allowance of a credit and the date of allowance of a refund. The committee reports, explaining the intention and purpose of subdivision (b) (2) of section 1116, support this interpretation. In reality, the allowance of a credit is the allowance of a refund. In either case that which is allowed is an overpayment. When a credit is allowed there is technically and legally the allowance of a refund, but, instead of paying the same by check, the amount thereof is applied in satisfaction of a tax due the government by the particular taxpayer for another year or period. In actual practice, refunds and credits are allowed by the Commissioner on the same schedule and in the same manner, and the procedure in both cases is the same.

In this case the Commissioner signed the schedule of overassessment September 20, 1926, and the amount of $103,347.78 thereof, which had been paid, was applied by the collector on October 1, 1926, to the satisfaction of the outstanding tax indebtedness of $114,753.38 of the plaintiff on the original return for 1920. The credit was therefore allowed September 20, 1926. As stated in United States v. Swift & Co., 282 U. S. 468, 51 S. Ct. 202, 205, 75 L. Ed. 464, "This construction of the act brings about uniformity in administration, as it makes the allowance of credits and refunds simultaneous." The proviso contained in the first deficiency act,

approved February 28, 1927, hereinbefore quoted, required the report to the Congressional Joint Committee on Internal Revenue Taxation only with respect to "any claim allowed" by the Commissioner, and, in order to make such report, it was not necessary for the Commissioner to cancel his allowance of the overpayment to be credited or repaid by check.

Plaintiff urges that this court held in Atlas Power Co. v. United States, 40 F.(2d) 136, 69 Ct. Cl. 558, that a credit is allowed within the meaning of section 1116 of the Revenue Act of 1926 when the Commissioner signs the schedule of refunds and credits. The question in that case was whether the credit was taken on the date the Commissioner signed the schedule of overassessments or the date on which he signed the schedule of refunds and credits, or the date on which he mailed to the taxpayer the certificate of overassessment. Both the schedule of overassessments and the schedule of refunds and credits involved in that case were signed and approved by the Commissioner prior to the enactment of the Revenue Act of 1926. That case is not, therefore, authority for the contention made by the plaintiff in this case.

In view of our conclusion that the credit was allowed under section 1116 of the Revenue Act of 1926 when the Commissioner signed the schedule of overassessments on September 20, 1926, it is not necessary to discuss the claim of the plaintiff that a credit is allowed under the 1926 act when the Commissioner signs the schedule of refunds and credits, and that the relisting of the overpayments and credits, which first appeared on the schedule of refunds and credits duly signed by the Commissioner within the period of limitation within which the tax for 1920 could be legally collected, on a supplemental schedule which the Commissioner signed October 31, 1927, had the effect of making that date the date of the allowance of the credit.

The petition is dismissed. It is so ordered.