Booth, Chief Justice,
delivered the opinion:
The plaintiffs are Harry B,. Carroll and Louis D. Carroll, copartners doing business under the firm name of Carroll Electric Company. This suit arises out of a written contract executed by the plaintiffs and the Chief of the Bureau of Yards and Docks of the Navy Department on October 4, *115 1917. The contract obligated the plaintiffs to furnish,* deliver, and install the outside tunnels, tunnel piping, and the outside pipe distributing systems at the Navy Yard, Norfolk, Virginia, in accord with the written contract and specifications. The contract was what is known as a lump-sum one, i. e., for the work to be done thereunder the plaintiffs were to receive $264,700. The work to be done under this contract embraced the laying of a concrete tunnel approximately 3,000 feet in length leading from a power house to three other buildings, inside of which were to be installed heating pipes and other pipes, subject to expansion and contraction, so as to prevent loss of heat and provide easy access in cases of needed repairs thereto. It also included a distributing system involving the laying of piping for the transportation of salt water throughout the navy-yard grounds — a fire precaution — another piping system for the distribution of fresh water to the various buildings on the grounds, and still another known as the compressed-air distributing system. The distribution of salt and fresh water required the use of cast-iron piping, whereas the compressed-air system exacted the use of wrought-steel piping properly welded and buried in the ground. The contract work was of such a character as to exact a minimum of skilled labor, and was to be completed within 120 days from the date of the delivery of the contract to the plaintiffs. The date of the contract is of importance, for on that date the war activities of the Government were acute, and at the Norfolk Navy Yard the Government was engaged in an extensive program of enlargement and improvement, involving the construction of various buildings and drydocks, and it was intended by the contract to supply these various units, as well as fire prevention, by means of the distributing system provided for in the contract.
The first item in suit is predicated upon a breach of the contract with respect to the failure upon the part of the Government to definitely fix the lines and situs of the work to be done, and to remove from the site the various obstructions which precluded the plaintiffs from proceeding with the work.
*116 Paragraph 5 of specification 2504 provided that—
“ LocatioN. — The work included under this contract shall be located at the navy yard, Norfolk, Va., approximately in the position indicated on the drawings. The exact location will be determined by the officer in charge.”
Paragraph 6 of the general specifications provided that — ■
“ Unless otherwise specifically stated, the contractor shall be allowed reasonable space at the site of the work and access to the same for receiving, handling, storing, and working material. * * * ”
It is not denied that, with the exception of anticipated requirements of sand, gravel, cement, and specified reinforcing steel, the plaintiffs immediately ordered and procured the essential materials to promptly commence the contract work. Keeping in mind the war-time period and as a consequence thereof, the Navy Department informed the plaintiffs that the necessary quantities of sand, gravel, and cement would be furnished by the department and the cost thereof credited to the Government upon the sum to be paid the contractor for the contract work. This was all done by the department in pursuance of a governmental policy by which the latter had taken over the distribution and sale of these materials to conserve the same for governmental purposes, and the public-works officer at the yard was in charge thereof. The same situation in most respects applied to the procurement of reinforcing steel. The plaintiffs were compelled to procure governmental priority orders to obtain shipment and were finally instructed to place orders for steel with the Cambria Steel Co., Philadelphia.
What has been said above is in no way contradicted, and the facts are set forth in connection with other facts as disclosing plaintiffs’ readiness and ability to perform the contract work. The record shows that plaintiffs promptly notified the Government officials in detailed schedules of the quantity of the above materials needed and the dates upon which the same should be supplied. The plaintiffs were never given complete and definite locations for the work to be done. No comprehensive plan or sketch of the locations was ever furnished the plaintiffs. On the contrary, a sketch *117 of tbe locations furnished by the plaintiffs to the public-works officer on October 10,1917, prior to the delivery of the contract in suit, indicating plaintiffs’ understanding of locations, was not approved. Instead, approval of locations was given by the public-works officer in “ piecemeal,” intermittently as to designated parts of the work, rendering it impossible for the plaintiffs to proceed in an orderly fashion in the performance of the contract. The record shows that on February 7,1919, within two days of a year subsequent to the contract date for the completion of the work, the plaintiffs were without information as to the location of certain fuel lines to be laid under the terms of the contract. The justification for this delay upon the part of the Government officials is found in the record. It is clearly an administrative one. The officials did not themselves know the precise limits of location, due to inability upon their part to definitely fix the locations to be allotted to the various buildings to be constructed upon the yard and with which the distributing system was to be connected. In the meantime, however, the contractor was not only retarded in the completion of its work, but was put to additional expense and costs aggregating a considerable sum of money. Labor could not be economically employed and sometimes not at all; materials could not be utilized, and the added expense of handling the same is proven in the record.
The record establishes, as shown in finding VI, that the site of the contract work in suit was at no time cleared to a sufficient extent to enable the plaintiffs to carry on performance of the contract, either economically or expeditiously. In fact, the record indisputably establishes that the site of the work and the location for its performance were occupied with railroad tracks of other contractors, heaped high in some locations with excavated materials from the dry dock excavation, and so circumscribed in limits and obstructions that the contractor was precluded from keeping in continuous operation a new steam shovel purchased for excavating purposes, and otherwise employing labor and materials except at greatly enhanced cost and expense, and also prolonging the period of performance at the expense of the contractor. The record is most convincing that definite and *118 comprehensive locations for the work were never given and that the Government officials signally failed to afford the contractor an unobstructed site within which to perform the work. As a matter of fact it is clear from the record that the Government officials were duly cognizant of this situation and did not seek to remedy it because of the pressing necessity, in their view, of having other contract work proceed unhampered and uninterrupted by the performance of this contractor’s work. So that, in our opinion, we have in suit, in so far as this item is involved, the one legal question as to whether under the contract the Government was obligated by its terms to furnish the contractor within a period of time sufficient to enable it to perform its contract with locations and an unobstructed site of reasonable proportions to perform the contract work. It is true neither the contract nor specifications fix a definite date for giving the contractor exact and comprehensive locations for the work, or upon which the site would be free from obstructions, and available for the prosecution of performance. Upon this fact the counsel for defendant predicate a defense, insisting that the contractor’s work was a part of a large undertaking then in progress and that the contract specifically provided that the contractor would carry on its work so as not to interfere with other contractors. As to this contention we are unable to follow the defendant’s counsel. On the contrary, the contract held the contractor to a limited time for performance, and the express terms thereof obligated the Government to not only afford the contractor the indispensable locations for performance, but allot it a reasonable space for access thereto and for handling, storing, and receiving the essential materials to perform. The contractor could do nothing until the Government acted. All contract work was in the open outside of any buildings; it was capable of being accom-lished concurrently with other work. No one testifies to the contrary, and assuredly it may not be said that a stipulation in a contract of the character of the one herein involved may be construed to relieve the Government from acting within such a time as would enable the plaintiffs to perform the obligations they had assumed. The contractor, it seems to us, had a lawful right to prepare at once to perform the *119 contract and rely npon the Government to comply with its terms, and there is nothing in the record warranting the court to hold that the Government possessed the contractual right to delay and retard performance because the officials in charge deemed the contractor’s work of less pressing importance than other work going on in the yard. We think the contractual obligation of the Government which we cannot ignore, under the quoted paragraphs of the specifications imposed a duty to so act with respect thereto as to enable the plaintiffs to peform their contract work according to the contract, and that the Government failed to observe the same. A case similar to this was before this court in Me-OlosT&ey v. United States, 66 C.Cls. 105,128. The contractor, McCloskey, entered into a time-limit contract with the Government to complete specified constructional work upon a given site “ when site is completely cleared.” The Government official in charge assured the contractor the site would be completely cleared by July 1, 1919, and relying upon this assurance the contractor proceeded accordingly. The site was cleared in installments at much later periods of time and as a consequence the contractor was not only delayed in performance but suffered great loss in increased cost of labor, materials, etc., for which this court awarded him judgment. The court said:
“ It should be said further that in any event the defendant was bound to have the site cleared within a reasonable time. It failed to do this and for its failure must be held responsible. We are of the opinion that the early part of July, 1919, was a reasonable time.”
We could cite a number of cases affirming the opinion in the McCloshey case (supra), but do not regard it as essential to do so, for in our opinion the rule is firmly established that where the contractor is delayed in performance of his contract work, as the findings show in this case, and suffers losses that would not have been suffered except for the Government’s delay and failure to observe its obligations under the contract, the contractor is entitled to recover therefor.
Paragraph 17 of the specifications reads as follows:
“ 17. ChaNges. — The Government reserves the right to make such changes in the contract, plans, and specifications *120 • as may be deemed necessary or advisable, and the contractor agrees to proceed with such changes as directed in writing by the Chief of the Bureau of Yards and Docks. The cost 'of said changes shall be estimated by the officer in charge, and, if less than $500, shall be ascertained by him. If the cost of said changes is $500 or more, as estimated by the officer in charge, the same shall be ascertained by a board of not less than three officers or other representatives of the Government. The cost of the changes as ascertained above, when approved by the Chief of the Bureau of Yards and Docks, shall be added to or deducted from the contract price, and the contractor agrees and consents that the contract price thus increased or decreased shall be accepted in full satisfaction for all work done under the contract: Provided, That the increased cost shall be the estimated actual cost to the contractor at the time of such estimate and that the decreased cost shall be the actual or market value at the time the contract was made, both plus a profit of 10 percent.”
Acting under the authority of the above provision, changes were ordered by the Government officials and the work exacted by them duly performed by the plaintiffs. The plaintiffs were paid for changes in accord with the method of procedure set up in paragraph 17. The changes ordered indisputably involved delay. The record in this respect is positive.
Paragraph 18 of the specifications provided for payment for extra work in the following terms:
“ 18. Extras. — -The contract price shall cover all expenses, of whatever nature or description, connected with the work to be done under the contract. Should the contractor at any time consider that he is being required to furnish any material or labor not called for by the contract, a written itemized claim for compensation therefor must be submitted by him to the officer in charge, who will refer the same at once with full report and recommendation to the Navy Department, Bureau of Yards and Docks, for decision and formal order covering approved items, if any. The failure or neglect of the contractor to present as above his claim for material or labor alleged to be extra within 60 days after being required to furnish or perform the same shall be deemed and construed as a waiver of all claim and right to additional compensation for the furnishing or performance of the alleged extra material or labor, and the contractor agrees to accept the finding and action of the Navy Department, *121 Bureau of Yards and Docks, in the premises as conclusive and binding.”
Extra work was ordered and performed by the contractor. On February 8, 1918, the contractor was instructed to build a tunnel inside the structural shop, and the record proves that in the performance of changes and extra work the contractor received instructions to complete the same *at the earliest possible date, even though it result in retarding the completion of the original contract work. The changes and extra work orders approximated in the aggregate $100,000. A careful consideration of the record undoubtedly establishes that the performance of changes delayed performance of the original contract work. Of course the plaintiffs may not recover for this delay. The contract provisions contemplated this event, and the pay provisions compensated the plaintiffs accordingly. The importance of the facts with regard to this issue centers upon the finding of the court (finding VIII) that notwithstanding the delay occasioned by changes and extra work, the contractor would and could have completed the entire contract work by July 18,1918, and that the extra cost and expense incurred by the contractor subsequent to that date are ascribable to a failure of the Government to observe its obligations under the contract, as heretofore discussed. It is not always easy to make a finding such as we have in finding VIII. In this case, however, the difficulty in so doing has been effectually removed by the record. The defendant substantially admits delays, asserting that the record does not establish unnecessary delays upon the part of the Government. The issue, as we view it, is not dependent upon existing necessities as to either party to the contract. The terms of the contract and the law applicable to contractual relationship govern, and the court in adjudicating the issue is not permitted to take in the situation from any other angle. War times prevailed. They were acute when the contract was made, and the subject matter of the contract concerned an integral part of war-time activity. The difficulties in the way of performance, we think, were within the contemplation of the parties when the agreement was made, and cannot be *122 availed of by either .party in the absence of a rule of law excusing performance because of their presence.
The record affords no justification whatever for a finding that the Government officials in charge did fix a definite and complete site for the location of the contract work, or made any special effort to clear the site of obstructions so as to enable the contractor to proceed in an orderly and expeditious manner in performing the contract work. With commendable fairness the witnesses for the defendant, while excusing to a degree the admitted existence of this condition, do not deny that it obtained.
The damages suffered by the contractor because of this breach of the contract are limited to the loss actually sustained because thereof. Finding XII discloses the two proven items of actual expenditures incurred by way of increase in wages and cost of superintendence. United States v. Wyckoff Co., 271 U.S. 268. The court eliminates all other items, of loss claimed, such as delay in delivery of materials, etc., and allows only those proven by testimony of record from the books and accounts of the contractor, and witnesses in the case.
Paragraphs 12, 18, and 14 of the specifications we quote in full, viz:
“ 12. ExteNsioN of time. — For causes of the character hereinafter enumerated extensions of time for the completion of the work may be allowed. Should the contractor at any time consider that he is entitled to an extension of time for any cause, he must submit in writing to the officer in charge an application for such extension, stating therein the cause or causes of the alleged delay. The officer in charge will refer the same at once, with full report and recommendation to the Navy Department, Bureau of Yards and Docks, for consideration and for such action as the circumstances may warrant. The failure or neglect of the contractor to submit, as above provided, his claim for extension of time within 30 days after the happening of the cause or causes upon which his claim is predicated, shall be deemed and construed as a waiver of all claim and right to an extension of time for the completion of the work on account of the alleged delay, and the contractor agrees to accept the finding and action of the Navy Department, Bureau of Yards and Docks, in the premises as conclusive and binding.
*123 “ 13. Damages eor delay. — In case the work is not completed within the time specified in the contract, or within such extension of the contract time as may be allowed, it is distinctly understood and agreed that deductions at the rate named in the specifications of the work shall be made as liquidated damages and not as penalty from the contract price for each and every calendar day after and exclusive of the date within which the completion was required up to and including the date of completion, said sum being specifically agreed upon as a measure of damage to the Government by reason of delay in the completion of the work; and the contractor agrees and consents that the contract price, reduced by the aggregate damages so deducted shall be accepted in full satisfaction for all work done under the contract.
“ 14. Unavoidable delays. — Unavoidable delays are such as result from causes which are beyond the control of the contractor, such as acts of Providence, fortuitous events, inevitable accidents, abnormal conditions of weather or tides, or strikes of such scope and character as to interfere materially with the progress of the work. Delays caused by acts of the Government will be regarded as unavoidable delays. Delays in securing delivery of materials, or by rejection of materials on inspection, or by changes in market-conditions, or by necessary time taken in submitting, checking, and correcting drawings or inspecting material, or by similar causes, will not be regarded as unavoidable. Should any delay in the progress of the work seem likely to occur at any time, the contractor shall notify the officer in charge in writing of the anticipated or actual delay, in order that a suitable record of the same may be made. (See par. 12.)”
The contractor did not complete the contract work involved until November 8, 1919, 637 days beyond the agreed date of completion stated in the original contract. In pursuance of the above paragraphs of the specifications, applications, as shown by finding X, were duly made by the contractor for extensions of time and the remission of liquidated damages for delay. On January 5, 1922, the Chief of the Bureau of Yards and Docks, in writing, extended the contractor’s time for completion 637 days, and liquidated damages for delay were not assessed against the contractor. Subsequently a voucher for $13,656.70 was prepared by the Bureau of Yards and Docks, duly approved by the proper officials, and transmitted to the General *124 Accounting Office for direct settlement. The General Accounting Office declined to make settlement in accord with the final determination of the Navy Department (Bureau of Yards and Docks), predicating the refusal upon the grounds that the contract did not provide for furnishing-materials by the Government, and in volunteering so to do the Government incurred no responsibility for the incidental delay caused thereby; that the Government was without authority to restrict the recruiting and employment of labor or fixing wages to be paid, and that the applications for an extension of time were not rested upon weather conditions or other causes specified in the contract. As a result of the review of the causes for delay recited in detail in the letter of the Chief of the Bureau of Yards and Docks dated January 5, 1922, the General Accounting Office set aside the findings so made and held the contractor responsible for 184 days’ delay, which at the rate of $15 per day fixed in the contract as liquidated damages, amounts to $13,800, a sum of $143.30 in excess of what the contractor alleged to be due, the defendant in the brief insisting that the plaintiffs are chargeable with 191 days of delay, and that the Government is entitled to judgment therefor in the sum of $668.30. The contention thus made and the undisputed facts with respect thereto raise the question as to the finality and conclusiveness of the “ finding and action of the Navy Department, Bureau of Yards and Docks ”, with respect to the question of delay and consequently the liability of the contractor, under the contract, for liquidated damages.
The issue is not a new or novel one insofar as judicial precedents are concerned. At least beginning with the case of Kihlberg v. United States, 97 U.S. 398, to the present time, the Supreme Court has uniformly held that in Government contracts containing provisions similar to the one in suit, the parties are competent to bind themselves to the conclusiveness and finality of the action and findings of the department with which the contract is made, and that such action is not open to the supervisory power of the courts unless overturned by proof of fraud or such gross error as *125 to warrant the implication of fraud. In the Kihlberg case (supra) the Supreme Court, in deciding a case wherein authority to fix distances was granted an officer of the Government by the terms of the contract, said (pp. 401-402) :
“ The parties, however, concurred in designating a particular person — the chief quartermaster of the district of New Mexico — with power not simply to ascertain, but to fix, the distances which should govern in the settlement of the contractor’s accounts for transportation. The written order of General Easton to the depot quartermaster at Fort Leavenworth was an exertion of that power. He discharged a duty imposed upon him by the mutual assent of the parties. The terms by which the power was conferred and the duty imposed are clear and precise, leaving no room for doubt as to the intention of the contracting-parties. They seem to be susceptible of no other interpretation than that the action of the chief quartermaster, in the matter of distances, was intended to be conclusive. There is neither allegation nor proof of fraud or bad faith upon his part. The difference between his estimate of distances and the distances by air line, or by the road usually travelled, is not so material as to justify the inference that he did not exercise the authority given him with an honest purpose to carry out the real intention of the parties, as collected from their agreement. His action cannot, therefore, be subjected to the revisory power of the courts without doing violence to the plain words of the contract. Indeed, it is not at all certain that the Government would have given its assent to any contract which did not confer upon one of its officers the authority in question. If the contract had not provided distinctly, and in advance of any services performed under it, for the ascertainment of distances upon which transportation was to be paid, disputes might have constantly arisen between the contractor and the Government, resulting in vexations and expensive and, to the contractor oftentimes, ruinous litigation. Hence the provision we have been considering. Be this supposition as it may, it is sufficient that the parties expressly agreed that distances should be ascertained and fixed by the chief quartermaster, and in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, his action in the premises is conclusive upon the appellant as well as upon the Government. The contract being free from ambiguity, no exposition is allowable contrary to the express words of the instrument.”
*126 In United States v. Gleason, 175 U.S. 588, 602, the Supreme Court said:
“Another rule is, that it is competent for parties to a contract, of the nature of the present one, to make it a term of the contract that the decision of an engineer, or other officer, of all or specified matters of dispute that may arise during the execution of the work shall be final and conclusive, and that, in the absence of fraud or of mistake so gross as to necessarily imply bad faith, such decision will not be subjected to the revisory power of the courts. Martinsburg & Potomac Railroad, v. March, 114 U.S. 549; Chicago, Santa Fé, &c. Railroad v. Price, 138 U.S. 185.”
Again, in the same opinion, wherein this court was reversed, the Supreme Court said (p. 607) :
“ The fallacy, as we think, in the position of the court below was in assuming that it was competent to go back of the judgment of the engineer, and to revise his action by the views of the court. This, we have seen, could only be done upon allegation and proof of bad faith, or of mistake or negligence so great, so gross, as to justify an inference of bad faith.” See also Lustbader case, 62 C.Cls. 549.
In Penn Bridge Co. v. United States, 59 C.Cls. 892, this court, in a contract case substantially similar in all respect to the instant case, went exhaustively into the issue of authority to review the actions of the department when the contract by its terms conferred authority to determine the question, and the decision was made final and conclusive. Brinck v. United States, 53 C.Cls. 170. The defendant’s opposition to a judgment for this item is embraced in an argument that the facts disclose that the plaintiffs did not, as to claims for extension of time, as to labor restrictions, “ flu ” epidemic, and stated delivery of steel, request the same within the time limit set up in the contract, and -that this omission, as well as the lack of authority under the contract upon the part of the Navy Department to extend the time for the causes l enumerated, is fatal to the claim. No challenge is made as jto the findings in so far as the causes for delay are concerned. What is relied upon is an absence of authority upon the part of the proper officials of the department to act at all. To support the argument two cases, the Wisconsin Central0 R.R. *127 Co. v. United States, 164 U.S. 190, and Whiteside v. United States, 93 U.S. 247, are cited. Both, cases, in our opinion, are inapposite. Precedents are numerous sustaining the rule that officials of the United States may not, without authority, bind the same by any act or declaration so as to give rise to a cause of action predicated upon such acts or declarations, and upon precisely the same principle of law the United States is not responsible for unauthorized payments made by one of its officials under a misconstruction of the law. The plaintiffs in this case are not seeking, under the conten- r tion advanced with respect to this item, damages against then <■ United States. The sum demanded is the exact sum earned! by the plaintiffs under the pay provisions of the contract and payment withheld because of alleged delays, an issue of fact! j by the contract to be determined in its finality by the Bureau of Yards and Docks of the Navy Department. The parties! by express agreement conferred the authority upon the department to so act, and agreed that the determination of the > parties would conclude all controversy as to the same. Fraud in so doing is not alleged, no errors of such a gross nature are shown to warrant a finding of constructive fraud, and we are unable to justify a review of this proceeding by this court, in view of established precedents and prevailing rules of contract law.
Counsel for defendant request the following finding of fact:
“Plaintiffs have presented a claim against the United States on account of an alleged additional bond premium, which was never claimed by the bonding company and never paid by plaintiffs.. Said claim was false and plaintiffs had no reasonable ground for presenting the same against the United States.”
Section 172, Judicial Code, title “ The Court of Claims,” is as follows:
“ Sec. 172. Any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance of any claim or of any part of any claim against the United States, shall, ipso facto, forfeit the same to the Government; and it shall *128 be the duty of the Court of .Claims in such cases to find specifically that such fraud was practiced or attempted to be practiced, and thereupon to give judgment that such claim is forfeited to the Government and that the claimant be forever barred from prosecuting the same.”
Defendant invokes the provision of the above section and insists upon a forfeiture of plaintiffs’ claim and a dismissal of the petition herein. The court may not, we think, ignore this serious charge of fraud. In plaintiffs’ petition and an exhibit thereto is found an item included as one for which recovery should be allowed of $5,283 for additional bond premium. Harry E. Carroll, general manager of the Carroll Electric Company, and one of the plaintiffs in this suit, testified before a commissioner of this court that he had every reason to believe that an additional bond premium of $5,283 had actually been paid, and, if not, the liability to pay existed and the amount would be paid. He did not say the sum had been paid. Dwight N. Burnham, a certified public accountant employed by the plaintiffs to go over their books of account, testified in the case, and the gist of his evidence is to the effect that inasmuch as the original bond purchased by the contractor extended over a period of one year and the contract work was not completed until some time in the third year thereafter, renewal bond premiums were charged. In other words, where the bond given for the performance of the contract which was to be performed within 120 days from its delivery, and because of changes and extensions of time it could not be performed within the contract period, a renewal or extension of the bonding company’s liability is essential to cover the added cost of the contract work to the Government. The defendant called as a witness Alfred E. Wales, chief clerk of the accounting department, Globe Indemnity Company, the company which furnished plaintiffs’ bond, and he testified that the original premium paid by plaintiffs for the original bond was $2,647, and that while no renewal premiums were charged, an additional premium of $888.90 was charged and a further charge of $181.02 would be due when a final *129 agreement as to plaintiffs’ contract price was reached. This, in substance, is the state of the record with respect to the charge of fraud, except the admitted fact that following the testimony of Mr. Wales, the plaintiffs eliminated this item from the suit and make no claim therefor. The court is not to presume that plaintiffs sought by a fraudulent statement and proof to recover from the United States a sum to which they were not entitled. The burden of establishing fraud is upon the defendant. Globe Works v. United States, 45 C.Cls. 497. Actual fraud manifestly involves an intentional misrepresentation, a corrupt intent, to' mislead the injured party and gain an advantage by so doing. It is the law that contractors must enter into approved security for the faithful performance of their contracts, and it is likewise established that a change in contractual relationship during the performance of the contract which increases or diminishes the contractor’s compensation or extends the time for performance entails a corresponding change in the bond given. The findings disclose that this precise situation obtained as to the plaintiffs, and while accuracy of statement as to the additional premium said to have been made was available, it is significant that the witness would not say the sum had actually been paid. The room for an honest mistake is obvious. The element of doubt as to intent to defraud is too great to warrant the court in imputing to the plaintiffs an intent to commit a fraud. The testimony relied upon was given publicly before a commissioner of the court, the plaintiffs knew it was subject to rebuttal, and the facts upon which the plaintiffs rested the statement were fully disclosed. Forfeitures are not favored in the law, and while this court has never hesitated in proper cases to enforce section 172 of the Judicial Code, it has uniformly held to the rules of law applicable to the proof of fraud essential to warrant forfeiture. We do not think the record warrants the giving of the finding asked, and for that reason have not included the same in the findings of the court. United States v. Colorado Anthracite Co., 225 U.S. 219.
The plaintiffs are entitled to a judgment as follows: Increased cost of labor subsequent to July 18, 1918, $52,752.99; cost of additional superintendence, $17,369.55; liquidated *130 damages for delay deducted from contract price, $13,656.70, a total sum of $83,779.24. It is so ordered.
Whaley, Jwdge; Williams, Judge; and LittletoN, Judge, concur.