**MITCHELL CANNERIES, Inc. v. UNITED STATES.**

No. 47282.

Court of Claims.
May 3, 1948.

J. Harry Covington III, of Washington, D. C. (H. Thomas Austern and Covington, Burling, Rublee, Acheson & Shorb, all of Washington, D. C., on the brief), for plaintiff.

Kendall M. Barnes, of New York City, and Herbert A. Bergson, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

HOWELL, Judge.

This case is brought by Mitchell Canneries, Inc., a Florida corporation, engaged in the packing of canned food products. On the 29th of May 1944, the name of Mitchell Canneries, Inc., was changed to Mitchell Properties, Inc. In addition, the owners, Fondren Mitchell, Guyton Mitchell, and Virginia S. Mitchell had formed a partnership and were doing business under the name and style of Mitchell Canneries. Thereafter on November 30, 1944, the corporation, Mitchell Properties, Inc., was dissolved and all assets were transferred to Fondren Mitchell, Guyton Mitchell, and Virginia S. Mitchell, who were the sole and only stockholders, who continued the business under the partnership, Mitchell Canneries.

The original petition in this court was filed in the name of Fondren Mitchell, Guyton Mitchell, and Virginia S. Mitchell, who were doing business as partners under the name of Mitchell Canneries. This petition was filed on August 14, 1946. Subsequently the assets of this partnership were transferred to the plaintiff corporation, Mitchell Canneries, Inc., a Florida corporation, which was incorporated under the

500

laws of Florida November 27, 1926. Thereafter, an amended petition was filed in this court on July 28, 1947, changing the name of the plaintiff from Fondren Mitchell, Guyton Mitchell, and Virginia S. Mitchell to Mitchell Canneries, Inc.

On May 29, 1942, Mitchell Canneries, Inc., the predecessor Georgia corporation, entered into Army contract No. W-1307-QM-868 with the United States Government for the delivery of canned blackberries. This contract called for a supply of 18,000 dozen No. 10 cans of blackberries at a unit price of $6.57 per dozen.

Deliveries under this contract were made to the extent of 4,732 dozen cans. Thereafter, due to adverse weather conditions, it became impossible for Mitchell canneries, Inc., to make further deliveries to the United States Government and on July 15, 1942, a letter was addressed to Major E. J. Brugger at the California Quartermaster Depot, explaining that the full contract could not be completed and requesting permission to make shipments from a location other than that called for in the contract. The plant had been moved to a new location in an effort more nearly to complete the contract. This letter was supplemented on July 23, 1942, by a telephone conversation between Mitchell Canneries, Inc., and Major Brugger, to the effect that the adverse weather conditions would prevent any further deliveries under the contract.

The Army contract under which the blackberries were to be supplied was the standard form used by the Army in purchasing supplies and provided specifically for the steps to be taken when there were delays or failure to complete. In the event that the contractor failed to make deliveries the government was, by the terms of the contract, permitted to purchase similar material or supplies in the open market and the contractor held liable for any excess cost, but it further provided that the contractor was not to be held liable for excess costs incurred when the delay or failure to deliver was due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including but not restricted to numerous named causes among which was unusually severe weather.

Between September 7, 1942, and September 28, 1942, the defendant made purchases in Oregon and Washington against the account of Mitchell Canneries, Inc., at cost of $15,338.45.

Major E. J. Brugger, who was the contracting officer for the incomplete contract No. W-1307-QM-868 had, prior to this, made inquiry of the Department of Agriculture as to the weather conditions in the area from which Mitchell Canneries, Inc., proposed to deliver the blackberries. Further inquiries had been made of Department of Agriculture representatives in Georgia, Florida, Texas, and Maryland. All information Major Brugger received from the Department of Agriculture indicated that crops were short, all packs were short and that weather conditions were decidedly important in causing the contract not to be filled. The agricultural representatives reported that the entire pack of Mitchell Canneries, Inc., was applied against the contract, that the heavy rains had shortened the blackberry crop, interfered with picking, kept all surplus labor in the peanut fields and produced a continual struggle with wineries for the small crop.

On October 14, 1942, the Army Quartermaster office had written Mitchell Canneries, Inc., requesting remittance of an excess cost of $15,610.07 due to the failure to make deliveries under the contract. This amount was adjusted to $15,338.45, when the Comptroller General issued certificates. By letter of October 22d the contractor had replied protesting assessment of cost on the ground that the bid was based on reasonable expectation on ability to complete; that every effort had been made to complete the contract, the entire pack of Mitchell Canneries, Inc., had been applied against the contract and that failure to complete was due to conditions beyond the control of Mitchell Canneries, Inc., namely, labor shortage, unfavorable weather conditions and competition for a limited supply of berries.

On October 30, 1942, Major Brugger, the contracting officer, issued his findings to the effect that the failure of Mitchell Canneries, Inc., to complete contract No. W-1307-QM-868 was due to unforeseeable

causes beyond the control and without the fault or negligence of Mitchell Canneries, Inc.

On August 30, 1943, Mitchell Canneries, Inc., entered into contract No. W-04-115-QM-1305 with the War Department whereby they undertook to sell and deliver canned blackberries for the contract price of $14,034.20. These blackberries were delivered by Mitchell Canneries and accepted by the defendant.

On May 14, 1944, the partners had entered into Army contract No. W-28-021-QM-13339 with the War Department whereby they undertook to sell and deliver to the United States Government canned grapefruit juice for the contract price of $54,821.98. In accordance with the terms of said contract the partnership, Mitchell Canneries, delivered the grapefruit juice to the defendant who accepted it.

On April 17, 1944, the Comptroller of the United States issued certificate No. 081-3328 setting off the $14,034.20 due the plaintiffs under Army contract No. W-04-115-QM-1305 against the amount of $15,-338.45 claimed to be due for excess costs incurred by the government in making purchases in the open market after failure of Mitchell Canneries to complete the first blackberry contract of May 29, 1942.

On September 27, 1944, the Comptroller General issued certificate No. 0876723 setting off $1,304.25 due Mitchell Canneries under Army contract No. W-28-021-QM-13339, for grapefruit juice, against the balance claimed to be due for excess costs under the first blackberry contract of May 29, 1942.

On April 16, 1945, plaintiff requested the Comptroller General to review these claims of set-off. On July 18, 1945, the Comptroller General affirmed his earlier rulings and stated that he found there was no legal basis for relieving Mitchell Canneries from liability for the excess costs incurred by the United States by reason of their default under Army contract No. W-1307-QM-868.

The principal question in this case is whether or not the findings of the contracting officer, to the effect that the failure to complete the performance of contract No. W-1307-QM-868 was due to an unfore- seeable cause without fault or negligence of the contractor, were correct and binding and that whether the contractor, under the terms of the contract, was thereby relieved of any liability for excess costs incurred by the defendant because of the contractor's inability to complete the contract. This pertinent provision of the contract is as follows:

## DELAYS—DAMAGES

If the contractor refuses or fails to make deliveries of the materials or supplies within the time specified in the purchase order, or any extension thereof, the Government may by written notice terminate the right of the contractor to proceed with deliveries or such part or parts thereof as to which there has been delay. In such event, the Government may purchase similar material or supplies in the open market or secure the manufacture and delivery of the materials and supplies by contract or otherwise, and the contractor and his sureties shall be liable to the Government thereby; Provided, that the contractor shall not be charged with any excess cost occasioned the Government by the purchases of materials or supplies in the open market or under other contracts when the delay of the contractor in making deliveries is due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes unless the contracting officer shall determine that the materials or supplies to be furnished under the subcontract are procurable in the open market if the contractor shall notify the contracting officer in writing of the cause of any such delay within ten (10) days from the beginning thereof, or within such further period as the contracting officer shall, with the approval of the head of the department or his duly authorized representative, prior to the date of final settlement of the purchaser, grant for the giving of such notice. The contracting officer shall then ascertain the facts and extent of delay and his findings of fact therein, a copy of which shall be furnished the contractor, shall be final and

502

conclusive on the parties hereto, subject only to appeal within thirty (30) days by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay shall be final and conclusive on the parties hereto.

Attention is directed particularly to the last sentence of the above paragraph wherein it is provided:

The contracting officer shall then ascertain the facts and the extent of the delay and his findings of fact therein, a copy of which shall be furnished to the contractor, shall be final and conclusive on the parties hereto * * *.

■ The established principle of law that findings of fact of a contracting officer are binding upon both the Government and the contractor if there is no fraud, gross error or arbitrariness by the contracting officer amounting to bad faith, has been considered by this court and the Supreme Court many times. United States v. McShain, 1939, 308 U.S. 512, 60 S.Ct. 134, 84 L.Ed. 437; Plumley v. United States, 1912, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342; United States v. Gleason, 1899, 175 U.S. 588, 20 S.Ct. 228, 44 L.Ed. 284; Kihlberg v. United States, 1878, 97 U.S. 398, 24 L.Ed. 1106; McCloskey v. United States, 1945, 103 Ct.Cl. 254; Carrol et al. v. United States, 1932, 76 Ct.Cl. 103; Penn Bridge Co. v. United States, 1924, 59 Ct.Cl. 892.

■ It has also been stated that where the contracting officer acted fairly and impartially in making his findings and there is substantial evidence to support such findings, they should not be reversed. Rego Building Corporation v. United States, 99 Ct.Cl. 445; Maurice L. Bein v. United States, 101 Ct.Cl. 144.

The evidence shows that the findings of the contracting officer were based principally upon reports of the United States Department of Agriculture representatives who it must be agreed were disinterested persons. In his findings the contracting officer recited that the Department of Agriculture representative at Thomasville, Georgia, reported that heavy rains had shortened the crop. This representative

also explained that the rains had kept all surplus labor in the peanut fields. However, the contracting officer did not rely solely on the Department of Agriculture representative at Thomasville, which was the immediate vicinity in which the plaintiff was attempting to obtain blackberries. He also obtained additional information from other representatives which showed that in Georgia, Florida, Texas, and Maryland, the blackberry crop was short and that all canneries who had Army contracts were using their entire packs to meet their government contracts.

Mitchell Canneries, Inc., had previously notified the contracting officer that due to unusual weather conditions they were unable to furnish any more berries under the contract; that they had made every effort to secure blackberries within a radius of 600 miles, and that they had moved their cannery in an attempt to fulfill the contract. After a consideration of these matters of fact, the contracting officer on October 30, 1942, made this finding:

I therefore find that failure of Mitchell Canneries, Inc., to complete contract No. W—1307—qm—868, was due to unforeseeable causes beyond the control and without the fault or negligence of the contractor.

(S) E. J. Brugger,
Major, Q. M. Corps.

■ The Comptroller General in his letter to Mitchell Canneries, of July 18, 1945, ruled that there was no basis for relieving the contractor from responsibility on the ground that the findings of the contracting officer were not findings of fact but conclusions of law and hence not binding on the parties. The plaintiff urges that the findings made by the contracting officer were ones of fact. The United States Supreme Court has recently held that the unforeseeability of floods is a question of fact which, in the absence of a finding of fact conclusive upon the contractor, must be decided by the Court of Claims. United States v. Brooks-Callaway Co., 1943, 318 U.S. 120, 63 S.Ct. 474, 87 L.Ed. 653. Under the contract involved in that case there was a clause similar to the one here involved, excusing the contractor from damages from unforeseeable causes including,

floods. The court there held that under the contract the flood to be excusable must be unforeseeable, and as there was no showing of a conclusive finding that the flood was unforeseeable, the case was returned to this court.

The defendant insists that the findings of the contracting officer amount to a construction of the contract in that they construe the contract as providing that blackberries should be supplied only from a certain area. We cannot agree that this is the case. The contracting officer was instructed by the terms of the contract to find as a fact whether unforeseeable and unusually severe weather resulted in the contractor's inability to deliver on the date specified in the contract. It is certainly a question of fact whether or not there existed unforeseeable and unusually severe weather, which resulted in the inability to perform the contract. If this is not considered as a question of fact, it is hard to conceive of any case where the findings of the contracting officer are to be considered ones of fact. Such a view would result in all cases under government contracts involving findings by contracting officers being brought into the courts. Certainly this is contrary to the intent of the standard form of government contract which contemplates that most cases of nonperformance will be disposed of by the contracting officer.

From the facts before us in this case we can find no evidence of fraud, gross error, or arbitrariness on the part of the contracting officer and on the contrary find that he acted fairly and impartially and that the evidence upon which he based his findings was substantial.

The defendant has contended that the liquidated damages clause in the contract which is set out in full in this opinion makes findings of the contracting officer final only in cases of delay and not in cases of failure to perform. We cannot agree with this construction, especially in view of this specific language:

If the contractor refuses or fails to make deliveries * * *.

This certainly indicated that "delay" as used in this provision of the contract is intended to cover both the concepts of delay and failure. The principal intent is apparently to make provision for all situations where the government is forced to purchase goods in the open market because of failure to receive those due under the contract. It is certainly not intended that the government could purchase goods only in the event of delays and could not do so if the contractor failed to deliver. It would indeed be a queer result if the contracting officer could make no findings when an entire blackberry crop failed and deliveries were made impossible, but could do so where seasonal delays caused late deliveries. In both situations the government might terminate the right of the contractor to make deliveries, but interpretation of the clause to cover only delays in performance would lead to this inevitable result. The word "delay" was properly employed because of this right of the government to terminate the privilege of the contractor to proceed with deliveries. Once the right is terminated it makes no difference to the government whether or not the contractor could have eventually made deliveries. Any failure to make deliveries on time is a delay whether there is ability to perform late or not at all. In this respect we are of the opinion that the findings of the contracting officer on the contractor's inability to make deliveries are also binding.

The defendant in its brief has dealt at some length with the cases of Sunseri v. Garcia & Maggini, 1929, 298 Pa. 249, 148 A. 81, 67 A.L.R. 1428; Newell v. New Holstein Canning Company, 1903, 119 Wis. 635, 97 N.W. 487; McFarland v. Savannah River Sales Company, 3 Cir., 1918, 247 F. 652; Pacific Sheet Metal Works v. Californian Canneries Company, 9 Cir., 1908, 164 F. 980. Suffice it to say, none of the contracts involved in these cases involve the standard form of government contract. None of them contain such complete coverage of the procedure to be followed in the event of failure to deliver goods on time, as is contained in the standard form here under question.

It might be pointed out here that regardless of whether or not a contract provides for findings, there must be some reasonable limit to the area from which a contractor can be expected to acquire raw

materials in performance of a contract. If the doctrine that a contractor may not be excused when materials are available anywhere, at any price, were carried to its logical conclusion, it would follow that there would have to be complete crop failure over the entire surface of the world before a contractor could be relieved from damages. If some small quantity of materials had been available in some distant country, a contractor could not be excused. The blackberry crops in Oregon and Washington from which the government purchased materials in the open market when the contractor could not complete the contract here involved, were so far from the contractor as to be practically out of his reach. The contract was made during time of war to be performed when transportation was difficult and space in refrigerator cars for shipment of perishable goods was painfully inadequate. These facts have bearing on the reasonableness of the contracting officer's findings. It would be an unconscionable result to hold the contractor liable for damages for failure to complete the contract when the raw material was actually unobtainable.

The defendant has also argued that mere intervention of conditions which render performance more expensive do not relieve a contractor as a general proposition of the law. This is not involved in this case because the situation just does not exist. We have no way of knowing whether the contractor by paying a high price out of all reason could have obtained enough blackberries to fill his contract. The defendant has pointed out that there is no finding that if the contractor had received all the blackberries in its area he still would have been unable to fulfill the contract. We do not think such a finding is necessary as a condition precedent to relief of a contractor from damages. United States v. Brooks-Callaway, supra.

The defendant also contended that the assignments by which this claim was transferred to plaintiff are invalid as against the United States. The prohibition against assignment of claims (R.S. Sec. 3477, 54 Stat. 1029, 31 U.S.C.A. § 203) is inapplicable. Legal title to the claim under contract No. W–04–115–QM–1305 on which $14,034.20 was withheld, under claim of set-off, was transferred from the predecessor corporation, Mitchell Canneries, Inc., to the partners who were at all times the equitable owners, being the sole and only stockholders of the corporation. The partners who did business as Mitchell Canneries were the owners of the claim under contract No. W–28–021–QM–13339 under which $1,304.25 was withheld on a claim of set-off. Both of these claims passed to the present plaintiff corporation when the business of the partnership was reincorporated under the laws of the State of Florida. The government itself in making the set-offs has already acknowledged that the identity of the partnership, Mitchell Canneries, and the corporation, Mitchell Canneries, Inc., are essentially the same. It has been specifically held that transfers by operation of law or in conjunction with changes of corporation structure are not assignments prohibited by the statute. Seaboard Air Line Railway v. United States, 1921, 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149; Novo Trading Corporation v. Commissioner of Internal Revenue, 2 Cir., 1940, 113 F.2d 320; Kingan & Company v. United States, 1930, 44 F.2d 447, 71 Ct.Cl. 19; Roomberg v. United States, D.C.E.D.Pa. 1941, 40 F.Supp. 621.

Judgment will be entered in favor of the plaintiff in the amount of $15,338.45. It is so ordered.

JONES, Chief Justice, and MADDEN, WHITAKER and LITTLETON, Judges, concur.