**RAMSELIUS et al. v. UNITED STATES.**
**No. 48538.**

United States Court of Claims.
May 19, 1950.

Leonard G. James, San Francisco, Cal.,
Chalmers G. Graham, Clarence G. Morse

and Graham & Morse, San Francisco, Cal., on the briefs, for plaintiffs.

J. Frank Staley, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

On January 27, 1942, plaintiffs and the United States Army Transport Service entered into a charter party for plaintiffs' ship Elna. The ship was delivered to the Army Transport Service on February 2, 1942, and was released to plaintiffs by this Service on June 12, 1942. On the latter date it was requisitioned for use by the War Shipping Administration and was operated by that governmental agency under a charter agreed upon by the parties until December 27, 1943, when the vessel became a constructive total loss. Plaintiffs sue for the charter hire to which they say they are entitled, first, under the army charter, and, second, under the War Shipping Administration charter, and for the value of the consumable stores on board at the time of the delivery of the vessel to the defendant, and, the vessel having been lost, they also sue for the value of the vessel, with interest.

1. Article 6 of the army charter provided that "Owners shall be paid at the rate of hire to be decided and approved by the United States Maritime Commission, and set out in Supplementary Agreement hereto per dead-weight ton per month based on about 2,662 tons, which, for the purpose of computing hire only, is agreed to be the dead-weight tonnage of the vessel."

■ The War Shipping Administration fixed a rate of $1.25 per dead-weight ton and calculated the amount due under the army charter by multiplying this sum by 2,082 tons, which it found was the dead-weight tonnage of the vessel. However, the proof shows, and the commissioner has found, that during the year 1941 and the early part of 1942 the market rate for charter hire was $3.00 or more per dead-weight ton. We have adopted the commissioner's finding as being clearly supported by the evidence.

The Maritime Commission itself approved this rate of $3.00 per dead-weight ton, and the evidence shows that numerous lumber schooners of characteristics similar to the Elna were chartered during the year 1941 and the early part of 1942 at not less than $3.00 a ton. On June 20, 1941, the Casper was chartered at this rate; on June 30, 1941, the Silverado was chartered at $3.50 a ton, and on December 10, 1941, at $3.50 a ton; on July 31, 1941, the Lumberlady was chartered at $3.50 a ton, and on January 4, 1942, it was chartered at $3.00 a ton; on November 6, 1941, the Lake Frances was chartered at $3.00 a ton, and again on December 9, 1941, she was chartered at the same rate; on December 22, 1941, the Oliver Olson was chartered at $3.00 a ton. These rates continued in effect until approximately the time that the Elna was requisitioned. Owners of other lumber schooners were able to realize this rate for the use of their schooners. It seems just that plaintiff should do so.

In addition, as we shall see later, the War Shipping Administration on May 14, 1942, issued its General Order No. 8 establishing time charter rates for requisitioned vessels which amounted to a bare-boat rate in excess of $3.00 a ton.

■ The agreement of the parties that the rate of hire should be established by the Maritime Commission was of course with the implied understanding that the rate established should not be arbitrary but should be a reasonable one. For instance, the parties could not have meant to agree that the Commission was empowered to fix a rate of one cent per ton, or any other manifestly inadequate sum. Cf. Ice Service Co. v. Henry Phipps' Estates, 245 N.Y. 393, 157 N.E. 506, 53 A.L.R. 692, and cases there cited; Needles for Use and Benefit of Needles v. United States, 101 Ct.Cl. 535, 600–607; Loftis v. United States, 76 F.Supp. 816, 110 Ct.Cl. 551, 630, et seq.; Mitchell Canneries v. United States, 77 F.Supp. 498, 111 Ct.Cl. 228, 247; Penner Installation Corp. v. United States, Ct.Cl., 89 F.Supp. 545. The rate of $1.25 fixed by

the Maritime Commission was unreasonable. Any rate less than $3.00 a ton, according to the evidence in this case, would have been an unreasonable rate. We hold, therefore, that the plaintiffs are entitled to recover for the use of their vessel by the Army Transport Service $3.00 per dead-weight ton.

Not only did the War Shipping Administration fix a tonnage rate which was considerably below the prevailing market rate, but it also established the dead-weight tonnage of the vessel at 2,082 tons, whereas the charter definitely provided that, for the purpose of computing hire for the vessel, its dead-weight tonnage should be taken to be 2,662 tons. Article 6 of the army charter provided that the owners should be paid the rate fixed by the Maritime Commission "based on about 2,662 tons, which, for the purpose of computing hire only, is agreed to be the dead-weight tonnage of the vessel." Manifestly, the War Shipping Administration had no right to compute the hire to be paid under the army charter on any basis other than 2,662 tons.

Plaintiffs are entitled to recover for the use of its vessel by the Army Transport Service $3.00 a ton based upon 2,662 tons. This amounts to $34,872.20, plus insurance of $5,675.11 paid by the owners during the period of the Army charter.

2. As heretofore stated, the War Shipping Administration requisitioned this vessel on June 12, 1942. On that date plaintiffs and the War Shipping Administration entered into what is called a "Requisition Bareboat Charter." Article C of the charter relating to charter hire reads in part:

"*Option I.* A basic rate of $1.00 per dead-weight ton per month, subject to adjustment as hereinafter provided in Special Provision J—4 (a) of this Part I, * * *.

"*Option II.*—75 percentum of the rate payable in accordance with Option I above and such further sum, if any, adjudicated to be necessary to make up just compensation for the use of the Vessel and the services required in connection therewith under the terms of this Charter, pursuant to the provisions of Section 902 of the Merchant Marine Act, 1936, as amended [46 U.S.C.A. § 1242]."

Plaintiffs elected rate option II. Having done so, we are required to fix just compensation for the use of the vessel.

We have found that $3.00 a dead-weight ton was a reasonable rate under the army charter. The War Shipping Administration requisitioned the vessel about four months after the date of the army charter. There is no evidence that, had there been a free market, the owners would have been compelled to take less on June 12, 1942, for the use of their vessel than they could have secured on February 2, 1942, when the army charter was entered into.

■■ In Smith-Douglass Company, Inc., v. United States, Ct.Cl., 81 F.Supp. 215, 217, we said: "* * * to avoid purely capricious valuations having no relation to true value, every effort should be made to bridge across the gap during which there was no market by projecting the former market, if it was not too remote, on the trend shown by the evidence, or of which we are judicially aware, thus reaching, as nearly as we can, the figure that we think a willing buyer would have given a willing seller for the ship."

Applying this rule to the present case, we find that $3.00 a dead-weight ton was just compensation for the use of the vessel under the War Shipping Administration charter.

General Order No. 8 of the War Shipping Administration establishing time charter rates gives support to this conclusion. In order to reduce time charter rates to bareboat charter rates it is customary to deduct from the time charter rates the items of operating expense payable under the time charter by the owner of the vessel. We have found that these operating expenses amounted to $2.63 a ton, based on a dead-weight tonnage of 2,662 tons, $2.80 a ton based on a dead-weight tonnage of 2,507 tons, and $3.37 a ton on a dead-weight tonnage of 2,082 tons. General Order No. 8 fixed the rate for time charters at $6.75 per dead-weight ton for vessels of from 2,000 to 2,499 dead-weight tons, and the rate of $6.40 per dead-weight ton for vessels of from 2,500 to 2,999 dead-weight tons. Deducting from these figures the operating

expenses, it will be seen that the time charter rates fixed by this General Order No. 8 of the War Shipping Administration produces a dead-weight tonnage rate of something in excess of $3.00 a ton.

The next question is to determine the dead-weight tonnage of the vessel.

The War Shipping Administration charter provided that the dead-weight tonnage should be determined in accordance with General Order No. 9 of the War Shipping Administration. Paragraph 6 of this order reads in part: "*Dead-weight determination.* —Dead-weight capacity is to be established in accordance with normal summer freeboard as assigned pursuant to the International Load Line Convention, * * *."

This International Load Line Convention, however, did not establish the dead-weight capacity of the Elna because this Convention expressly excluded from its operation existing ships of the United States of the lumber schooner type. However, in 1935 Congress enacted the Coastwise Load Line Act, 49 Stat. 888, 46 U.S.C.A. § 88 et seq. This authorized the Secretary of Commerce to establish load lines, giving due consideration to and with the direction to apply a differential for the various types and character of vessels and the trades in which they were engaged. This Act also provided that no load line should be established which gave a lesser freeboard than the load line established by the International Treaty on Load Lines of 1930.

The International Load Line Convention established four load lines, Tropical, Summer, Winter, Winter North Atlantic. It also authorized special load lines for vessels carrying timber deck cargoes. These were Tropical, Summer, Winter and Winter North Atlantic. These special timber load lines, except in the case of Winter North Atlantic, were higher on the hull and permitted deeper loading and, hence, a greater dead-weight tonnage than the similarly described load lines for carrying general cargoes.

No load line for the Elna was established by the Secretary of Commerce until June 29, 1944, when the Bureau of Shipping issued a certificate that the "Vessel's dead-weight capacity for cargo, fresh water, stores and Permanent Bunkers in the foregoing condition is 2,082 tons (of 2,240 pounds)."

In addition to this certificate, however, the American Bureau of Shipping wrote plaintiffs' attorneys, in the letter enclosing the certificate, saying: "Regarding the dead weight we advise that we can only assign dead weights based upon the vessel's International Summer Freeboard in accordance with the War Shipping Administration's instructions. However, for your information, at the assigned timber load line the vessel's dead weight would be increased approximately 425 tons over the value given on the certificate."

■ The evidence and the findings show that lumber schooners are especially designed for the carriage of lumber and that when loaded with lumber they can be more heavily loaded with safety than with general cargo. It seems that most of the lumber, or a large part thereof, at least, is loaded on the deck of these schooners, and the rest of it in the hold. The ships are so constructed as to be safe and efficient when so loaded. The certificate and the letter of transmittal show this vessel could safely carry 425 more tons of lumber than the weight of general cargo which it could safely carry.

This vessel was specially designed for the carriage of lumber; it had been used in this trade by its owner, and after it was requisitioned by the defendant it was still used for this purpose. It seems clear, therefore, that the dead-weight tonnage to be used in computing compensation for the use of the vessel for the carriage of lumber should be the 2,082 tons plus the additional 425 tons which it could safely carry when loaded with lumber. This produces a dead-weight tonnage of 2,507 tons. (Determined from actual performance the vessel's dead-weight tonnage was 2,662 tons.)

In paragraph 3 of Article J of Part I of the War Shipping Administration charter the owner represented that her dead-weight tonnage was 2,500 tons, 7 tons less than the amount found by the American

Bureau of Shipping. We disregard this small difference.

Since the charter provided for determination of the dead-weight tonnage pursuant to the International Load Line Convention, plaintiffs are entitled to recover for the use of the vessel under the War Shipping Administration charter $3.00 per dead-weight ton per month based upon a tonnage of 2,507 tons, which the certificate of the Bureau of Shipping shows was determined pursuant to the International Load Line Convention. This amounts to $139,138.50. From this, however, there is to be deducted the sum of $34,634.03, which amount has already been paid plaintiffs.

3. As heretofore stated, the vessel became a constructive total loss on December 27, 1943. Option I in Part I, Article E, of the War Shipping Administration charter, reads:

"E. Total Loss Valuation:

"*Option I.*—The sum of $65.00 per dead-weight ton computed in accordance with General Order No. 9 of the Charterer * * *."

The War Shipping Administration charter also provided for the payment of an additional $5.00 per dead-weight ton for each knot, or major fraction thereof, over 8½ knots. The certificate of the American Bureau of Shipping declares that this vessel had a speed of 10 knots. This was the representation made by the owner in the War Shipping Administration charter.

The valuation of the vessel is, therefore, as the parties apparently agree, to be computed at $75.00 per dead-weight ton. As we said in the discussion of the charter hire to be paid for the vessel, her dead-weight tonnage is 2,507 tons. The amount to be paid for the loss of the vessel is, therefore, $188,025.00. From this sum there is to be deducted the payment by the defendant of $100,000 on January 26, 1945.

Under the charter the plaintiffs are entitled to interest on $188,025.00 at the rate of 3½ per cent per annum beginning 120 days from December 27, 1943, the date of the vessel's loss, until January 26, 1945; and interest at the same rate on $88,025.00 from January 26, 1945, until paid.

4. The charter also provided that the owners are entitled to the value of the consumable stores on board the vessel at the time of her delivery to defendant. We have found that the value of these stores is $2,073.49.

Plaintiffs are not entitled to interest on this amount, nor on any other item of their claim except for the loss of the vessel.

On the whole case plaintiffs are entitled to recover the sum of $235,150.27, plus interest on $188,025.00 at 3½ per cent per annum beginning 120 days from December 27, 1943, until January 26, 1945, and interest at 3½ per cent per annum on $88,025.00 from January 26, 1945, and continuing until paid.