**The NEW YORK GUARDIAN MORTGA-GEE CORP., Plaintiff,**

v.

**Max CLELAND, Administrator of the Veterans Administration, and the Government National Mortgage Association, Defendants.**

**No. 78 Civ. 3649.**

United States District Court,
S. D. New York.

May 8, 1979.

See also, D.C., 473 F.Supp. 409.

Milgrim, Thomajan & Jacobs, New York City, for plaintiff; George L. Graff, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendants; David M. Jones, Asst. U. S. Atty., New York City, Jane M. Edmisten, Asst. Gen. Counsel, Finance, Kathleen D. Koch, Atty. Advisor Dept. of Housing and Urban Development, Washington, D. C., of counsel.

LASKER, District Judge.

This action arises on cross motions for summary judgment. The New York Guardian Mortgagee Corp. ("Guardian") seeks to recover from the Veterans Administration ("VA") on eight claims totalling $96,775. plus interest stemming from VA guarantees of home loans. The VA seeks dismissal of these claims.

I.

*FACTS*

The case involves the interplay of two closely related federal programs—the Mortgage Backed Securities Program of the Government National Mortgage Association

(GNMA) and the Home Loan Guaranty Program of the VA—both of which have as their purpose the encouragement of private investment in residential mortgages. Both programs seek to stimulate such investment by providing investors with the assurance, backed by the full faith and credit of the United States, that their investment will be repaid. Under the VA program, the VA encourages mortgage investors to provide home loans to veterans by guaranteeing some part of qualifying mortgage loans. 38 U.S.C. § 1801 *et seq.* Under the Mortgage Backed Securities program, discussed at some length in our recent disposition in this same action of cross motions by Guardian and GNMA, see *New York Guardian Mortgagee Corp. v. Cleland et al.,* 473 F.Supp. 409 (S.D.N.Y.1979), a qualifying investor assembles a pool of FHA insured or VA guaranteed mortgages and, after entering into a so-called "Guaranty Agreement" with GNMA, is authorized to issue securities "based on and backed by" the pooled mortgages and guaranteed by GNMA with the full faith and credit of the federal government. 12 U.S.C. § 1721(g). The holders of these securities receive "scheduled" payments of income and principal generated by the pool mortgages and also participate in any "pre-payments" arising either under the terms of the pooled mortgages or due to foreclosures on them. 24 C.F.R. § 390.5. The mortgage investor which has assembled the pool becomes an "issuer" upon entering into the Guaranty Agreement with GNMA and, as such, it assumes certain rights and duties which are discussed at greater length below.

In the present case, Eastern Service Corporation ("Eastern"), during 1971, placed the eight VA guaranteed mortgage loans in question here into three different GNMA pools and entered into three standard form Guaranty Agreements with GNMA (the Guaranty Agreement is set forth at Appendix 19 to the GNMA Mortgage Backed Securities Guide, GNMA 5500.1 Rev. 4 (hereafter "GNMA Guide")) so as to become "issuer" with respect to each pool. Between 1972 and 1975, each of the eight loans at issue here fell into default and foreclosure proceedings were instituted by Eastern. With respect to four of the loans (Pritchard, Brown, Rhett and Jones), the underlying property was conveyed to the VA following foreclosure, and claims were made by Eastern on the outstanding VA guarantees and for conveyance of the property.[1] The claimant in each case was stated to be "Eastern Service Corporation, Pool # xxx, GNMA." Although some parts of these claims were paid by VA, others were not and are now claimed by Guardian.

On April 29, 1975, Eastern assigned to Regency Equities Corp. ("Regency"), a subsidiary of Guardian, all of its interest in the mortgages in the three pools involved here as well as all its rights and duties under the corresponding Guaranty Agreements, and on July 12, 1975, GNMA approved the assignment, thereby recognizing Regency as issuer with respect to those pools. In a letter to the VA on August 5, 1975, Regency inquired about the unpaid claims already

1. The VA has several options which it may pursue when a mortgage guaranteed by it goes into default. See 38 U.S.C. § 1816(a); 38 C.F.R. § 36.4320. The VA claims that in the case of seven of the loans at issue here, it followed the procedures set forth in 38 C.F.R. § 36.4320, specifying before foreclosure a minimum amount to be credited to the indebtedness of the debtor. Following foreclosure, the VA alleges that Eastern (or its successor) elected to convey the property to the VA at the amount previously specified. Brodie Affidavit ¶ 27. Guardian claims that the VA chose to take an assignment of those seven loans and the property securing them before foreclosure as provided for in 38 U.S.C. § 1816(a). Although the VA asserts that this discrepancy creates a ma-
terial question of fact which should bar Guardian's motion for summary judgment, F.R.Civ.P. 56(c), it does not state why, or to what issue it considers it to be material or why it is fatal to Guardian's claims without also being fatal to its own motion to dismiss. It appears from the Brodie Affidavit (¶ 27) that the VA believes that under the § 36.4320 procedure, the loans in question were entirely terminated while still in the hands of Eastern and, therefore, ceased to be "guaranteed loans", assignable under 38 U.S.C. § 1802(c), and became naked claims on the VA and subject to the strictures of the Assignment of Claims Act, 31 U.S.C. § 203. In view of our disposition of that issue, we do not consider this discrepancy to be material. See discussion Part II(B)(2) *infra.*

filed by Eastern as well as two others (Taylor and Jamison), as to which Eastern had made no claim.[2] The VA responded, on August 18, 1975, that payment on all these claims was being held up pending certain investigations, but it noted that Regency would not be paid in any event since it "was not a true 'holder in due course' on date of assignment of the mortgage." On September 22 and 29, 1975, Regency submitted claims on two loans (Barraclough and Hardy) and on February 24, 1976, two more (Taylor and Jamison). In the case of each claim filed by Regency (whose name by that time had been changed to "Hamptworth Securities Corp."), the claimant was stated to be "GNMA pool # xxx" followed by the address of Hamptworth.[3]

During the pre-assignment period, Eastern is alleged by the VA to have perpetrated a variety of frauds on the VA in connection with other, unrelated, loans. Indeed, it appears that GNMA required Eastern to divest itself of its issuer status as a result of this alleged misconduct. After Eastern's assignment of its rights and duties as issuer to Regency, and after Regency's letter of August 5, 1975, the VA—on October 1, 1975 and March 1, 1976—notified Eastern that the amounts payable to Eastern on six of the claims involved here (Jones, Taylor, Jamison, Rhett, Pritchard and Brown) had been "set off" against Eastern's asserted indebtedness to the VA on seven other "tainted" loans. In the VA's view, these set-offs constituted a final disposition of the guaranty claims on those six loans.

On June 29, 1976, Regency assigned its rights and duties as issuer with respect to the three pools in question here to its parent Guardian. On March 11, 1977, in an action pending between it and Eastern, the Justice Department asserted counterclaims against Eastern for fraud which included the same fraudulent transactions the losses from which had assertedly been satisfied by

**2.** No copy of this letter is available, however, its receipt was acknowledged by the VA in a letter to Guardian dated April 18, 1975, which states in part:

"We are in receipt of your letter dated August 5, 1975 pertaining to the assignment of seven mortgages from Eastern Service Corporation to Regency Equities Corporation. The payment of claims on the cases listed below will not be paid until the completion of the investigation by VACO Investigation and Security Service:

LHG 487028    BROWN
    474684    PRITCHARD, C.
    475306    RHETT, R.
    473853    JONES, H.
    472798    TAYLOR
    476177    JAMESON, R.

In any event, payment of above claims will not be paid to Regency Equities Corporation since this corporation was not a true 'holder in due course' on date of assignment of the mortgages."

From this letter it is clear that the VA had actual notice of the assignment by Eastern of six of the eight claims disputed here. From Eastern's prior claims on for of these guaranteed loans—made in the name of "Eastern Service Corp., Pool ¨ xxx, GNMA"—the VA had or should have had actual knowledge that these loans constituted part of the base and backing of GNMA pools. From Regency's four subsequent claims made on September 22nd and 29, 1975 and February 24, 1976—made in the name of "GNMA Pool ¨ xxx, c/o Hamptworth Securi-

ties [Regency's changed name]"—it is clear that VA had actual knowledge that these loans were backing GNMA pools. The VA does not deny that it was aware of these things. It states only that certified copies of these assignments were "not filed with the VA or approved or acknowledged by an officer of the VA." Brodie Affidavit ¶ 28. At oral argument, counsel for the VA stated that the VA relied on the non-conformity of this notice with the Assignment of Claims Act in deciding to reject the claims by Regency and to attempt to satisfy those claims by "set-off" against Eastern.

**3.** The VA asserts that the Jamison and Taylor claims were not made in the name of the GNMA pools (Br. 10). Although it is true that the claim forms (Ex. 18 and 19) submitted on these two claims were not signed as being made in behalf of the pools (the Taylor claim was signed "HSC" [Hamptworth Securities Corp.] and the Jamison claim was not signed at all), the name and address of the claimant were presented at the very beginning of each claim as "GNMA Pool # xxx" followed by Hamptworth's address and name. The informality of the signing of these two claims may stem from the fact that they appear to have been hand delivered following discussions between Hamptworth and VA officials in which, Guardian asserts and the VA does not deny, Hamptworth officials were assured that they would be paid. Kaplan Affidavit ¶¶ 7 and 11. A letter accompanying these claims also referenced the GNMA pools. Ex. 20.

the offsets noted above.[4] On March 21, 1978, a settlement was reached in this dispute. Under the terms of the settlement, all of Eastern's claims against the United States were compromised for $1 million, all of which was retained by the United States in partial satisfaction of the Government's counterclaims.

Of the eight disputed claims, the VA maintains that six (Jones, Taylor, Jamison, Rhett, Pritchard and Brown) have been satisfied by set-off and that two (Hardy and Barraclough) were extinguished by the settlement agreement.

## II.

### DISCUSSION

#### A. Appropriateness of Summary Judgment: The Issues

At the outset, we must consider whether a "genuine issue as to any material fact" exists. F.R.Civ.P. 56. The VA argues that the guaranty claims here in question cannot be brought by Guardian because the assignments by virtue of which it asserts entitlement to them failed to conform to the Assignment of Claims Act, 31 U.S.C. § 203. Guardian responds that the Assignment of Claims Act is inapplicable here and that the set-offs and the settlement agreement which the VA claims discharged its guaranty obligations with respect to these eight claims, were ineffective. If the Assignment of Claims Act invalidates the assignments through which Guardian asserts its rights, Guardian's present claims against the VA must be dismissed for want of standing.[5] Since it is conceded that the assignments did not conform to the Act, no

questions of fact exist in connection with this issue.

Even if the Assignment of Claims Act bars Guardian's present claims, however, it will still be necessary to consider whether the VA has discharged its guaranty obligations via "set-off" or "settlement." GNMA recently sought, in this same action, to compel Guardian, as "issuer", to advance to pool security holders an amount equal to the uncollected "prepayments" involved here. Guardian countered seeking a declaration that it had no duty to make such lump sum advances of prepayments from its own funds. On January 8th, we held that during the period within which a GNMA issuer seeks with due diligence to collect on VA guarantees of foreclosed mortgages for the benefit of the pools, its only duty is to advance scheduled payments from its own funds. *The New York Guardian Mortgagee Corp. v. Cleland et al., supra,* 473 F.Supp. at 409. However, we reserved the question of whether an issuer has a duty to pay from its own funds a lump sum equal in amount to "prepayments" which are judicially determined to have been made by a guarantying agency (e. g. by set-off) but which are never received by the issuer. *Id.* at 417. This question was reserved because, due to our separate consideration of the dispute between Guardian and GNMA, we had no basis for determining whether a "prepayment" had in fact been made by the VA. Since that question is squarely raised here, we must now consider whether the set-offs and compromises noted above constitute "prepayments." If they do, then we must decide the question previously reserved. If, however, the VA has not made

---

**4.** Guardian argues that this indicates that the "set-offs" asserted by the VA were merely "sham" transactions. The VA responds that these counterclaims were made under the False Claims Act, 31 U.S.C. § 231, which allows double damages, and were not inconsistent with Eastern's prior repayment by set-off. This dispute need not be resolved.

**5.** If the Assignment of Claims Act does not apply, these claims clearly could not have belonged to Eastern at the time of the asserted set-offs and compromises. This would not, however, defeat the VA's set-off defenses since,

as a matter of general contract law, it appears that the VA could set-off against Guardian, as Eastern's assignee, any claims it had against Eastern which arose before it received notice of the assignment. See *South Side Bank & Trust Co. v. United States,* 221 F.2d 813 (7th Cir. 1955); 4 Corbin, *Contracts* §§ 896–897 (1951 ed.) Since all of the VA's fraud claims against Eastern arose before the VA received notice, Guardian must establish that such a set-off would have been improper in the first instance. See discussion in Part II(B)(1).

prepayment by way of set-off and compromise, Guardian can have no duty enforceable by GNMA to pay forward any equivalent amount, and the underlying obligation of the VA remains intact. Once again, no issue of fact material to this determination has been raised by either party. Since we conclude that these issues are decisive, it is unnecessary to consider additional factual questions suggested by the parties.[6]

### B. The Merits

■ 1. *Discharge by the VA of its Guaranty Obligation.* The VA does not dispute that its guarantees on the eight loans in question here were valid obligations which it was required to pay the proper party. It argues, however, that Eastern was the proper payee at the time of foreclosure on the underlying mortgages; that Eastern remained the proper payee since failure to comply with the Assignment of Claims Act prevented it from making any valid assignment of its claims on these guarantees; and that it has "paid" Eastern via set-off and compromise and thereby extinguished its obligations. The last argument is dealt with first.

The VA's arguments that it has discharged its guaranty obligations by set-off and compromise may be considered together since both proceed on the assumption that the guarantees in question were the personal assets of Eastern, which it was free to compromise or which its creditors were free to reach by set-off.[7] In support of this

assumption, the VA argues that a GNMA issuer's duty to make payments to security holders is a contractual obligation—i. e. that the issuer is obligor and security holders are third party beneficiaries of the Guaranty Agreement between GNMA and the issuer; it also argues that they are direct beneficiaries of the agreements stated in the GNMA Mortgage Backed Security Certificates. Since the application of payments arising from the pool mortgages in satisfaction of unrelated issuer debts does not alter the issuer's obligation to pay security holders amounts due to them, the VA argues, the issuer is the "real party in interest" on pool collections. Guardian responds that the trilateral arrangement between GNMA, its issuers, and security holders is more closely analogous to a trust relationship. Accordingly, it maintains that the general creditors of the issuer cannot reach assets, including claims asserted on behalf of the pools, held solely for the benefit of pool security holders.

Although the duty of a GNMA issuer to make payments to security holders is neither a "trust" nor a "debt" in the strictest sense, it has attributes of both, and for the purposes of determining whether pool assets should be sheltered from unrelated set-offs by a guarantying agency, these common law concepts provide a helpful framework for analysis.

Traditional characteristics of a trust relationship are that the trustee has a duty to

---

**6.** Although some relatively minor discrepancies exist between the VA's and Guardian's calculations of the amounts payable on the guarantees, Guardian has agreed to accept the VA's lower figure provided it is successful here. Guardian has also agreed to drop an additional claim as to which a factual dispute developed on the same condition.

**7.** It is assumed, for present purposes, not only that Eastern remained "proper payee" on these claims, as the VA argues, but also that Eastern's property interest in those claims remained the same as would be that of a GNMA issuer. Since the VA does not contend that Eastern remained an issuer at the time of the setoffs and compromises involved here, it could be argued that Eastern's assignment of its duty as issuer to pay the amounts collected on these

claims to security holders gave it an interest in the corresponding right to collect superior to that which it had held before. Of course, if the successful divestment of its duty to pay conferred on Eastern an unqualified title to the claims and their proceeds, then there is no question but that the set-offs and compromises were effective. It is hard to see, however, why the nature of Eastern's right to collect on these guarantees (which arose solely from its issuer status) should be altered simply because the Assignment of Claims Act prevented it from being transferred. Therefore, we shall deal with the VA's purported setoffs and Eastern's purported compromise as if they were asserted respectively against and by an issuer. We note that this seems to be an inarticulate premise underlying arguments raised on both sides.

deal with specific property as a fiduciary for the benefit of another; the beneficiary has an equitable interest in the trust property; if the trustee becomes insolvent the beneficiary remains entitled to the property and need not share it with general creditors; and there is an intent on the part of the creator of the trust that the party holding legal title to the property should have no beneficial interest in it. Scott, *Trusts* §§ 12–12.12 and 14–14.3 (1967 ed.); Restatement (Second) of Trusts §§ 12 and 14. By contrast, a debt is a personal obligation to pay a set sum; the creditor has only a personal claim—while he can proceed judicially against the property of the debtor, until he does so, he has no legal or equitable interest in it; and unless there is an adjudication in favor of the creditor, the debtor has beneficial and legal ownership of the property. *Id.* In ascertaining intent, an agreement to pay interest suggests a debt, however, if the person receiving property agrees to invest it for the benefit of the payor and to pay over to him such interest as is actually earned, a trust is indicated, Scott, *supra,* § 12.2 at 108–09; an agent making collections for another is ordinarily a trustee of the funds collected unless it is agreed that the agent is entitled to use the funds collected, *id.* at 113–14; and an agreement to segregate profits collected on behalf of another or to place them in a special account suggests a trust, *id.* at 114–15.

In light of these principles, the following characteristics of the relationship between GNMA, its issuer, and its security holders

seem relevant. The statute authorizing the program provides for issuance of securities "based on and backed by" specified guaranteed mortgages in a "trust or pool." 12 U.S.C. § 1721(g). The issuer, at the time the pool is created, assigns all its rights in the underlying mortgages (including its rights to all interest, principal, and other payments made on or with respect to such mortgages") to GNMA "[t]o provide a base and to back all securities issued . . . ." Guaranty Agreement § 3.01. The authority of the issuer to "file, process and receive the proceeds from . . . guaranty claims" is specifically made subject to this assignment. *Id.* § 4.14. The assignment to GNMA is then delivered "in recordable form but not recorded" to a custodian bank along with the mortgages themselves, the notes endorsed in blank, and the signed VA guarantees. Guaranty Agreement § 3.06. The assignment is to remain unrecorded unless the issuer defaults on payments to security holders and GNMA exercises its option to assume issuer responsibilities. *Id.* §§ 8.05, 8.08; 21 U.S.C. § 1721(g). Each mortgage backed security certificate states that the holder is "the owner of an undivided beneficial interest in the pool", which is certified to consist of mortgages guaranteed, *inter alia,* by the VA. A "custodial account" is established, into which the issuer deposits proceeds from the pooled mortgages and from which withdrawals may generally be made only for payments to security holders. Guaranty Agreements §§ 4.14, 7.03.[8] Article IV of the Guaranty

---

8. Section 4.12 provides:
   "Section 4.12. In addition to withdrawals to effect timely payment on securities outstanding under this Agreement, the Issuer may make withdrawals against the foregoing Custodial Account under Section 4.11 in order to remit to GNMA the monthly guaranty fee set forth in Section 1.04 above; to reimburse itself or GNMA for any advances made under Section 4.03 above to effect the timely payment of securities issued under this Agreement, provided that such reimbursement, in the case of each advance, shall be only for interest and principal, separately, advanced and paid on such securities, and only from related collections or other recoveries of interest and principal, separately, received from or on account of mortgages pooled under this Agreement, which collections or other recoveries were delayed in payment, and thus made the advance necessary; to reimburse itself or GNMA for the amount of any advance over and above the amount needed for the purpose of the advance; to effect the removal from the Custodial Account of any portions deposited therein of installments collected on the mortgages pooled under this Agreement for the purpose of the payment of late charges, or the removal of any other amounts deposited temporarily therein through error or otherwise; to compensate or pay itself, with the concurrence of and subject to and in accord with any applicable instructions and directions is

Agreement sets forth detailed accounting and reporting mechanisms for the protection of the security holders. *See, e. g.,* §§ 4.05, 4.06, 4.07, 4.11, 4.12, 4.13, and 4.18. Segregation of the cash flow from mortgages in the pool from the other assets of an issuer is strictly required. 24 C.F.R. § 390.-9(b). The issuer is paid a fee for its services in administering the pool based on and payable from the interest portion of each monthly installment. GNMA Guide at 5–1. Clearly the "pool or trust" administered by the "issuer" has many attributes of a trust administered by a trustee.[9] The pool of mortgages is comparable to the trust *res.* The Guaranty Agreement insures that the issuer retains only bare legal title sufficient to enable it to service the mortgages.[10] Security holders expressly take an undivided beneficial interest in the pool. To insure that the issuer deals with security holders in a fiduciary manner, a segregated custodial account is set up, and the issuer is required to deposit "all interest and principal collected on account of the pooled mortgages, including prepayments" in that account. Guaranty Agreement § 4.11. Issuer access to that account is strictly limited. *Id.* at §§ 4.12, 7.03.

If the securities at issue here were "straight pass-through" securities (i. e. the issuer's only duty is to pass through payments arising from pool mortgages as it receives them, 24 C.F.R. § 390.5), we would have virtually no reservations in finding a trust relationship. However, with respect to "modified pass-through" securities of the type here involved, the issuer is obliged to meet "scheduled" payments "whether or not collected." 24 C.F.R. § 390.5. Thus when amounts equal to scheduled payments are not collected from the pool mortgages, the issuer has a duty to advance from his own funds amounts equal to the payments which should have been collected. If the delinquent payments are ultimately forthcoming, the issuer may charge advances made against the custodial account. Guaranty Agreement § 4.12. If not the loss falls on the issuer. This aspect of the "modified pass-through" arrangement is clearly inconsistent with the trust model. Generally, a trustee's personal liability to the beneficiary is limited to breaches of his duties as trustee. Restatement (Second) of Trusts § 205. Losses stemming from the failure of trust assets to produce generally fall on the beneficiary. *Id.* § 204. "A trustee is not a guarantor of the value of the trust property." Scott, *supra* § 204, at 1662.

This arrangement, however, does not defeat the trust analogy. Most importantly, even in the case of modified pass-through securities the issuer is not personally liable either to security holders or to GNMA for payments due but not collected provided it diligently performs its duties as issuer. Guaranty Agreement § 7.01. The mortgage backed security certificates expressly state:

"... this Certificate does not constitute a liability of nor evidence any recourse against the issuer, since it is based on and backed by the aggregate

---

9. It seems worth noting that the Internal Revenue Service has determined that, for tax purposes, these arrangements should be treated as trusts. See Rev.Rul. 70–745 (sale of GNMA certificates transfers to certificate holders the sued by GNMA, monthly or otherwise, either for servicing the mortgages pooled under this Agreement, or in order to recover all or any part of any interest differential between the inflow of interest funds derived from the mortgages and the outflow of interest funds paid on the securities, together with such other outflow as shall be in accord with this Section 4.12; or to clear and terminate the Custodial Account at the termination of this Agreement subject to and in accord with Section 1.03 above."

equitable ownership in each pool mortgage; thereafter, issuer has only a contractual right to service the mortgages for a fee). See also Rev.Rul. 70–744.

10. Guardian refers us to an unpublished opinion by Judge Weinstein, *The New York Guardian Mortgagee Corp. v. Finnerty,* No. 78 Civ. 2295 (October 31, 1978, E.D.N.Y.), in which it was held that a judgment creditor of a GNMA issuer could not reach mortgages in the GNMA pools serviced by the issuer. Judge Weinstein appears to have found that the assignment by the issuer of all its interest in the mortgages to GNMA at the time the pools were created, see Guaranty Agreement § 3.01, divested the issuer of all interest in the pool mortgages.

debt of the mortgages insured or guaranteed under the laws of the United States . . . ., and since recourse may be had to the Government National Mortgage Association in the event of any failure of timely payment, as provided for in the Guaranty appended hereto."

The issuer's only obligation runs to GNMA, see Guaranty Agreement § 4.03, and GNMA's only sanction is to terminate an issuer's status if payment is not made. Guaranty Agreement Article VIII. Thus unlike the conventional debtor or obligor on a third party beneficiary contract, the personal assets of the issuer cannot be reached. The consequence of default is transfer of legal title in the pool mortgages to GNMA and loss of issuer status. It seems anomalous that those who have become creditors of an issuer from unrelated transactions should be given an access to these guaranty claims superior to that of those in whose behalf the claims are asserted.

Moreover, we recently held that although a GNMA issuer has a clear duty (albeit enforceable only by loss of status) to advance scheduled payments to security holders "whether or not collected", that duty does not extend to prepayments, which need not be advanced at least during the collection period. We left open the question of whether, once the collection period has ended and it is determined that a prepayment has been made, the issuer has any duty to make such prepayments from its own funds. The VA now asserts that there is such a duty and argues that this makes the issuer the "real party in interest" with respect to prepayments from pooled mortgages. The VA argues that since a GNMA issuer asserting a guaranty claim simply asserts that claim in order to free itself of a duty to pay which will arise if it does not collect, the proceeds of that claim must be deemed assets of the issuer.

This argument suffers from several defects. First, assuming without deciding

that the issuer is ultimately responsible to security holders for "prepayments" made but not received, it has already been noted that this responsibility would not constitute a conventional debt obligation, because the property of the issuer cannot be directly reached by either GNMA or the security holders. Moreover, the analysis proposed by the VA would enable guarantying agencies unilaterally to substitute for their own credit (which is presented to prospective GNMA investors as enhancing the safety of their investment, see Prospectus, GNMA Guide, Appendix 20, p. 4) that of the issuer. If it were not for the fact that GNMA also guarantees the investment of its security holders with the full faith and credit of the United States, this argument would be dispositive. Even considering the GNMA guaranty, however, it is by no means clear why the happenstance that the security holder is insured against loss by one government agency should affect his rights, as asserted by the issuer, against another. The Guaranty Agreement plainly states, § 6.04, that the GNMA guaranty shall not detract from the rights of security holders as set forth in the mortgage-backed security certificates. Those rights, of course, include a beneficial interest in the pool of guaranteed mortgages.

A more basic defect with the VA's argument, however, is that it proves too much. If an issuer stands in a simple debt relationship with security holders, there is no logical reason why pool mortgages themselves should not be subject to attachment by the general creditors of the issuer. Also a general creditor of an issuer could attach the issuer's right to collect on scheduled pool mortgage payments. In the latter case it is clear that the issuer has a duty to pay security holders "whether or not" the issuer collects (on pain of loss of issuer status). Yet it seems likely that such broad exposure of pool assets would substantially disrupt the GNMA program.[11] The pools

11. It could be argued, although the VA has not raised the point, that an issuer of modified pass-through securities is a "trustee" with respect to pool proceeds to the extent that they

are collected, but a "debtor" with respect to sums not collected. Cf. Scott, supra, § 12.11 (debt is substituted for trust by novation). This argument, although superficially narrow-

would become less stable; issuer defaults would increase; and GNMA, intended by Congress to be self-supporting partly due to the Government's already existing guaranty on pool mortgages,[12] would be faced with an increasing number of claims on its guarantees. Moreover, in situations such as the present, where a guarantying agency claims to have discharged its obligation by set-off, delays in the passing through of prepayments will inevitably arise while the issuer and the VA seek to vindicate their respective claims. This would interrupt the smooth functioning of the GNMA program.

We conclude that claims plainly asserted on behalf of GNMA pools should not be subject to set-offs arising from claims asserted by VA against the issuer personally. Prompt payment by the VA will insure that payments due to security holders will be quickly passed through to them. The VA is at all times free to bring an action against the issuer personally. Except perhaps for some litigation costs, this will generally not prove more expensive to the Government. If the issuer is solvent and the claim against it is valid, the VA will be reimbursed. If the issuer is insolvent, the burden will fall on the VA. However, if the VA were allowed to set off and the issuer were insolvent, the burden would simply be transferred to GNMA. The only difference, at least generally, is which pocket the Government pays out of.

In sum, we find that GNMA security holders are the beneficial owners of the proceeds of pool mortgages, and the VA is not free to treat claims made upon it by issuers on behalf of the GNMA pools as the personal assets of the issuer. To work an offset, the debts must be due and owing to and from the same persons in the same capacity. See *Nedd v. United Mine Workers of America,* 556 F.2d 190, 214 (3d Cir. 1977) (dictum); *Bulasky v. FDIC,* 442 F.2d 341 (9th Cir. 1971); Restatement (Second) of Trusts § 266. For the same reason Eastern had no power to compromise the United States' counterclaims against it personally by relinquishing claims which it was empowered to assert only in behalf of the pools. Therefore, neither the purported set-off nor the Settlement Agreement satisfied the VA's guaranty obligations.

■ *2. Assignment of Claims Act.* Having concluded that the VA has not discharged its guaranty obligations, it must be determined whether Guardian is the proper party to assert the corresponding guaranty claims. The VA maintains that Guardian is barred from recovery by the Assignment of Claims Act, 31 U.S.C. § 203.

The VA argues first that Eastern, as a GNMA issuer, was the proper payee at the time of default and foreclosure on the underlying mortgages. There seems to be little doubt but that a GNMA issuer is the proper payee on VA guarantees underlying pool mortgage loans. The VA is required by statute to pay the "holder" of the guaranteed obligation, 38 U.S.C. § 1816(a), and the VA asserts that its consistent administrative practice in connection with claims made on guaranteed mortgages backing issues of GNMA securities is to treat the GNMA issuer as "holder." Brodie Affida-

---

ing the exposure of the pools, actually does not advance matters. Creditors of the issuer could, as the VA has done here, simply act against the claim before it is collected, thereby converting what would otherwise be trust assets into assets personal to the issuer. To properly protect the GNMA system, it is necessary to view the claims on guarantees as being held in trust for the benefit of the security holders. Cf. Scott, *supra,* §§ 14.12, 15.

12. Senator Bennett, in floor debate on what was to become 12 U.S.C. § 1721(g), stated:
"The Government guaranty by GNMA will in a sense be a pass-through of the already existing Government guaranty or insurance of mortgages in the pools to the securities backed by the pools. It will not bring about an increase in the Government's total contingent liability, for the reason that the contingent liability of the Government is incurred at an earlier time when the mortgages are insured or guaranteed. GNMA is authorized to collect a fee for its guaranty, and it is intended that this program will be fully self-supporting and will operate at no cost to the Government."
114 Cong.Rec. 15,236 (1968).

vit ¶ 8.[13]  It is also clear from § 4.14 of the Guaranty Agreements entered into by GNMA and its issuers that the issuer, as part of its duties in servicing pool mortgages, is obliged to "file, process, and receive the proceeds from  .  .  .  guaranty claims."  Finally, although Guardian has sporadically suggested that the issuer is not the "holder",[14] it seems now to concede that it is.  Indeed, since Guardian's present claims are predicated on its own status as "issuer," this concession seems inevitable.

The VA next argues that Eastern must have remained the proper payee because the Assignment of Claims Act (the Act) prevented it from making any valid assignment.  The Act provides in pertinent part:

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof; except as hereinafter

provided, shall be absolutely null and void,  .  .  .."

The Act goes on to list certain formalities which, if complied with, preserve such assignments.  It is conceded that those formalities were not observed here.  The VA argues that its mortgage guarantees, although freely assignable up to a point, see 38 U.S.C. § 1802(c), become "claim[s] upon the United States" once the underlying mortgage is foreclosed and a demand for reimbursement is made.[15]

In the present case, Eastern foreclosed on all eight of the underlying mortgages prior to its April 29, 1975 assignment of its interests as issuer to Regency.  It had also filed guaranty claims on four of those mortgages, but had not received full payment.  Regency, after GNMA's July, 1975 approval of the April assignment, filed the remaining claims, and then, on June 29, 1976, assigned its interests as issuer to its parent Guardian.  The VA maintains that both these assignments fell within the Act and that, since they did not comply with its formalities, were "null and void".[16]  The VA con-

13.  It must be noted that, in the next breath, the Brodie Affidavit states: "In determining the proper payee on guaranty claims, the VA uniformly looks to the foreclosure proceeding to learn who was judicially held to be the holder of the loan and mortgage at the time of their termination."  *Id.* ¶ 8.  The difficulty here, of course, is that the plaintiff in the state foreclosure proceedings was not issuer at the time of payment.

14.  Guardian has variously asserted that the pools or GNMA might be deemed "holder".  Although the guarantees here are asserted on behalf of the pools, there is nothing to indicate that the VA is to pay the "pools" directly.  A more plausible case can be made for GNMA as holder.  VA regulations define a "holder" as "the lender or any subsequent assignee or transferee of the guaranteed or insured obligation."  38 C.F.R. § 36.4301(p).  Certainly GNMA is a subsequent assignee of sorts.  See Guaranty Agreement § 3.01.  Nonetheless, it would substantially distort the GNMA system to hold that GNMA is the proper party to collect on behalf of the pools.  This is clearly the function of the issuer, at least until it defaults and GNMA exercises its option to assume issuer duties.  Guaranty Agreement §§ 8.07, 8.08.

15.  Alternatively, the VA suggests that each of the guarantees in question here became

"claims" subject to the Act three months after default, since Eastern, under 38 C.F.R. § 36.-4316(a), at that point had an option to submit a claim, and the liabilities represented by the claims were no longer contingent.  Since we conclude that the Act does not apply under the present circumstances, this point need not be decided.

16.  Under this theory, the result of the second assignment (Regency to Guardian) would seem to be that Regency, as claimant, is the proper payee with respect to four claims.  However, the VA argues that Regency never became the proper payee, either because the guarantees here became claims three months after default even without demand, see note 15 *supra*, or because the language of 38 U.S.C. § 1816(a) prevents it.  Section 1816(a) states:

"In the event of default in the payment of any loan guaranteed under this chapter, the holder of the obligation shall notify the Administrator who shall thereupon pay to such holder the guaranty  .  .  .."

This latter argument, if successful, would be dispositive of claims by any party other than Eastern, which provided notice of default in connection with all of the loans here.  However, the VA somewhat undercuts its own position in its primary argument, the clear implication of which is that, had the present assign-

cludes that since it is obliged to pay the "holder" of a guaranty, 38 U.S.C. § 1816(a), and since Eastern, before its assertedly void assignment to Regency, was "holder", it must have remained "holder" at the time of the set-offs and the Settlement Agreement.

As already noted, see note 8 *supra,* the VA does not maintain that the assignments here were ineffective to convey issuer status to Guardian. To do so would be highly incongruous since GNMA, which is represented in this matter by the same attorney as the VA, has sought to enforce issuer duties against Guardian in connection with these very claims. See *The New York Guardian Mortgagee Corp. v. Max Cleland, et al., supra.* The Government argues that the assignments here were invalid only to the extent that they purported to convey "claims" already made against the United States at the time of the assignments. Thus the VA argues that Eastern remained "holder" of the claims at issue here even after it had ceased to be issuer with respect to the pools on behalf of which the claims were made.

This last point calls attention to the problematical aspects of the VA's argument. If Eastern can retain a "holder's" right to receive payment after having divested itself of an issuer's duty to pass that payment on to security holders, this anomaly seems to

strike at two important foundations of the GNMA mortgage-backed securities program—first, that the issuer is entitled to receive proceeds from the pools for the purpose of passing them on to security holders; and second that pool mortgages be insured or guaranteed, *inter alia,* by the VA.

█ In view of this apparent conflict between the Assignment of Claims Act as the VA would apply it here and these aspects of the GNMA program,[17] it seems appropriate to inquire whether the purposes of the Act would be served by applying it to claims which would otherwise be transferred as an incident to an assignment of GNMA issuer status. The Act has generally been viewed as having three purposes. It was intended "to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government"; "to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and enable the Government to deal only with the original claimant"; and "to save to the United States 'defenses which it has to claims by an assignor by way of set-off, counterclaim, etc., which might not be applicable to an assignee' ". *United States v. Shannon,* 342 U.S. 288, 291–92, 72 S.Ct. 281, 283–84, 96 L.Ed. 321 (1952). See also *United States v. Aetna*

---

ments conformed to the Act, they would have been valid. More importantly, we believe that this argument gives the "such holder" language of § 1816(a) more weight than it will bear. It is by no means clear why the VA should have to pay the party giving notice of default even if the claim is ultimately made by a different party. This would seem to thwart the policy favoring free assignability in connection with VA guaranteed loans. 38 U.S.C. § 1802(c) ("Nothing in this chapter shall preclude the assignment of any guaranteed loan or the security therefor"). The mere fact that a loan is in default terminates neither the loan nor the guaranty. Finally, this "such holder" language applies only to one of several options open to the VA on default and that option is not the one which the VA asserts it followed here. See note 1 *supra.*

17. We disagree with Guardian's suggestion that application of the Act in the present case would lead to some cataclysmic disruption of the GNMA system. That system has built-in safeguards which would minimize the actual

consequences to security holders of payment by a guarantying agency to one other than an issuer. Most importantly, of course, since GNMA guarantees the investment of GNMA security holders with the full faith and credit of the United States, no direct pecuniary loss can befall them. Even the assignee issuer would generally suffer no loss from the application of the Act since the effect of the barred assignment would generally be to establish an "equitable lien" in favor of the assignee on any claim retained by the assignor. *In re Freeman,* 489 F.2d 431 (9th Cir. 1973); *In re Ideal Mercantile,* 143 F.Supp. 810 (S.D.N.Y.), *aff'd,* 244 F.2d 828, 832 (2d Cir. 1957). Enforcement of this claim, however, would remain in the hands of the assignor. *United States v. Shannon,* 342 U.S. 288, 293, 72 S.Ct. 281, 96 L.Ed. 321 (1952). Nonetheless, the fact that the Act would not seriously affect GNMA security holders does not necessarily mean that its application is proper.

*Cas. & Surety Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949); *Goodman v. Niblack,* 102 U.S. 556, 560, 26 L.Ed. 229 (1880); *Matter of Ideal Mercantile Corp.,* 244 F.2d 828, 831 (2d Cir. 1957). Despite the broad language of the Act, numerous exceptions to it have been recognized when these purposes would not be served. It does not, for example, apply to involuntary assignments, *United States v. Gillis,* 95 U.S. 407, 24 L.Ed. 503 (1877); assignments by operation of law, *Erwin v. United States,* 97 U.S. 392, 24 L.Ed. 1065 (1878); voluntary assignments for the benefit of creditors, *Goodman v. Niblack, supra,* 102 U.S. 556, 26 L.Ed. 229; transfers by judicial order, *Keydata Corp. v. United States,* 504 F.2d 1115, 205 Ct.Cl. 467 (1974); subrogation, *United States v. Aetna Cas. & Surety Co., supra;* or certain changes in corporate form in which assets are transferred, *Seaboard Airline Rwy v. United States,* 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921) (consolidation); *Consolidated Paper Co. v. United States,* 59 F.2d 281 (Ct.Cl.1932) (merger). See generally, Moore, *Federal Practice* ¶ 17.09[1.–2] at 17–100 n.2.

As this large number of exceptions suggests, there must be some congruence between the Act and its purposes before it is ·applied. In the present case, there seems little danger that "persons of influence" might buy up VA mortgage guaranty claims held by GNMA issuers. An issuer's right to collect is limited under the Guaranty Agreement to collections made on behalf of the pools. See §§ 4.14, 3.01, 411.[18] Since the right to collect is inextricably linked to

the duty to pay, such claims can hardly be appealing to profiteers.[19] Moreover, since the VA guarantees are the subject of an unrecorded assignment to GNMA, and safely ensconced with a custodian bank in order to "base and to back" pool securities, *id.,* § 3.06, it seems clear that an issuer cannot take individual guarantees from the custodian and separately assign them. Rather the issuer cannot assign the Guaranty Agreement (the only source of his right to collect on the VA guarantees) "in whole or in part" without the written consent of GNMA. *Id.* § 9.03. This latter provision seems likely to protect the Government as a whole from assignments to professional claimants. Similarly, there is no danger that a guarantying agency will lose defenses of set-off or counterclaim since, as we have held, the VA cannot set its personal claims against a GNMA issuer off against claims asserted by that issuer on behalf of security holders.

The possibility that the government may be faced with multiple claimants is somewhat more troublesome,[20] but we think that, on balance, all interested parties, including the government, are better served by non-application of the Act. A guaranty claim brought by a GNMA issuer is somewhat unique since it is, in a sense, brought in behalf of the government as well as against it. Since GNMA securities are backed by the full faith and credit of the United States, 12 U.S.C. § 1721(g), GNMA is ultimately responsible for insuring that these payments reach security holders.

---

**18.** GNMA's standard form Assignment Agreement (¶ 2.1) also expressly recognizes that the assignee issuer takes his interest in the pools subject to the assignment by the original issuer, at the time the pools were created, of all his interest in the underlying mortgages to GNMA in order to base and back pool securities.

**19.** Since issuers of "modified pass-through securities" are required to maintain scheduled payments "whether or not collected", and since they can reimburse themselves from the custodial account if and when late payments are forthcoming, it is possible for an issuer to build up an "equity" in the guaranty claim. Nonetheless, any recovery would simply leave the

issuer in the same position as he would have been otherwise.

**20.** As one commentator has noted, virtually all of the numerous exceptions to the Act which have been recognized create some danger that the Government will be faced with multiple claimants. Comment, *Unassignable Claims Against the United States: A Commercial Anachronism,* 68 Yale L.J. 515, 520 n.23 (1959). For example, allowing transfers by will or intestacy or claims by partial subrogees may well force the Government to deal with a greatly expanded number of claimants. Despite the fact that this purpose of the Act is always to some extent disserved, exceptions are made.

While the issuer may be primarily responsible for such payments, GNMA must pay in the event of issuer insolvency or default. To the extent that application of the Assignment of Claims Act results in non-issuers being the proper payee on such claims, it may increase rather than reduce the chance of double payment by the government. We also note that where an assignee issuer seeks to collect on claims filed by an assignor issuer, and is plainly seeking to collect on behalf of GNMA pools, it would require no extensive investigation to confirm that the assignee issuer is the proper payee.

We conclude that the Assignment of Claims Act should not be applied in connection with assignments of issuer status done in accordance with GNMA requirements even when such an assignment has the effect of incidentally passing along a "claim" already filed by the assignor issuer on behalf of the pools. This seems consistent with the rule, applied in a somewhat analogous situation, that absent a change in beneficial ownership, the Act should not bar a shift in formal title to a claim. See *Mitchell Canneries, Inc. v. U. S.,* 77 F.Supp. 498, 504, 111 Ct.Cl. 228 (1948) (partnership assigns claim to corporate successor to partnership); *Wells Fargo Bank & Union Trust Co. v. United States,* 115 F.Supp. 655, 658 (N.D.Cal.1953), aff'd, 225 F.2d 298 (9th Cir. 1955) (transfer by corporation to sole stockholder); *Roomberg v. United States,* 40 F.Supp. 621 (E.D.Pa.1941). See also Comment, *supra,* note 20, 68 Yale L.J. at 521 n.31. This rule has been applied in this circuit, where it has been held that a liquidating distribution by a close corporation to its stockholders of a claim against the government is not subject to the Act. *Novo Trading Co. v. Commissioner,* 113 F.2d 320, 322 (2d Cir. 1940). There, the court noted that since the assignment merely passed legal title to parties who already owned the entire beneficial interest in the claim, it was not within the evils at which the Act is directed. *Id.* See also *Consolidated Paper Co. v. United States,* 59 F.2d 281, 288 (Ct.Cl.1932); *Kingan & Co. v. United States,* 44 F.2d 447, 450–51, 71 Ct.Cl. 19

(1930); *United States v. Improved Premises,* 204 F.Supp. 868, 871 (S.D.N.Y.1962). We conclude that here, where the beneficial interest also remained unchanged throughout, the result should be the same.

Guardian's motion is granted; the VA's motion is denied.

## ON AWARD OF INTEREST

On May 8, 1979 this Court concluded by summary judgment (1) that the Veterans Administration had not discharged its obligations as guarantor of the home mortgage loans involved in this suit, either by "set-off" or by settlement of fraud claims the government asserted against the party who through mesne assignments assigned the loans to the New York Guardian Mortgagee Corp. (Guardian); and (2) that Guardian was the proper party to assert the claims against the undischarged guaranty obligations, even though the assignments by which Guardian had asserted its entitlement to the claims did not conform to the Assignment of Claims Act, 31 U.S.C. § 203.

Guardian has submitted for the Court's approval and signature a proposed judgment and certification pursuant to Rule 54(b), Fed.R.Civ.P., awarding it $96,-779.37 plus interest on eight of the claims it sued upon, and the VA has submitted a counter-proposed judgment which, however, makes no award of interest. The government claims that the general rule that the doctrine of sovereign immunity bars an award of interest against the United States unless it is expressly authorized by statute or contract, *e.g., United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951), bars an award of interest against the VA in this case, too.

The government's position is mistaken.

First, Congress in 38 U.S.C. § 1820(a)(1) (1976), as amended by the Veterans Disability Compensation and Survivor Benefits Act of 1977, Pub.L.No. 95–117, § 403, 91 Stat. 1066, has empowered the Administrator to "sue and be sued" in his official capacity with respect to matters arising, *inter alia,* by reason of his guaranteeing home mortgage loans like those involved here, pursuant to 38 U.S.C. § 1801 *et seq.*

Second, there is a well defined exception to the general rule, that when the government embarks on business ventures such as issuing insurance policies or, presumably, guaranteeing home mortgage loans with Congressional authorization to "sue and be sued" in relation to such business, it thereby accepts equal footing with private parties as to the usual incidents of suit, including the award of interest on sums recovered. *E.g, National Home for Disabled Volunteer Soldiers v. Parrish,* 229 U.S. 494, 496-97, 33 S.Ct. 944, 57 L.Ed. 1296 (1913) (interest allowed on sums found due contractor with the Home, an agency which later was merged into the VA, see 38 U.S.C.A., History of Legislation, 28-29); *Standard Oil Co. v. United States,* 267 U.S. 76, 79, 45 S.Ct. 211, 69 L.Ed. 519 (1925) (war risk insurance policies); also see *Reconstruction Finance Corp. v. J. G. Menihan Corp.,* 312 U.S. 81, 85-86, 61 S.Ct. 485, 85 L.Ed. 595 (1941) (allowance of costs). In *Bituminous Casualty Corp. v. Lynn,* 503 F.2d 636, 643-46 (6th Cir. 1974) the court awarded pre- and post-judgment interest even in the absence of "broad 'sue and be sued' powers," (*see Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 388-89, 59 S.Ct. 516, 83 L.Ed. 784 (1941) (absence of "sue and be sued" clause not decisive)), observing that the Supreme Court had indirectly approved the continued vitality of the above cited cases in *NLRB v. Nash-Finch Co.,* 404 U.S. 138, 143 n.2, 92 S.Ct. 373, 30 L.Ed. 2d 328 (1971).

Finally, the cases the government has cited are inapposite. In two, *May Department Stores Co. v. Smith,* 572 F.2d 1275 (8th Cir.), *cert. denied,* 439 U.S. 837, 99 S.Ct. 122, 58 L.Ed.2d 134 (1978), and *DePaul Community Health Center v. Campbell,* 445 F.Supp. 484 (E.D.Mo.1977), the courts held that the Administrator was immune to garnishment procedures to effectuate judgments against VA employees in state courts. In *May Department Stores Co. v. Smith, supra,* 572 F.2d at 1277-78, the court included in its discussion of the legislative history of the 1977 amendment to 38 U.S.C. § 1820(a)(1) (not applicable to that case) language reaffirming Congress' intent that the "waiver of sovereign immunity in sec-

tion 1820 extends only to home-loan guaranty matters." S.Rep.No. 412, 95th Cong., 1st Sess., 22-23 reprinted [1977] U.S. Code Cong. & Admin. News pp. 2636, 2652-53.

Neither the garnishment cases the government has cited nor the amendment to 38 U.S.C. § 1820(a)(1) suggests that Congress or the courts have limited the extent of the waiver of sovereign immunity in suits relating to home-loan guarantees to exclude an award of interest where appropriate. Indeed, Congress' continued failure to prohibit the award of interest in such suits suggests at least Congressional acquiescence in such awards.

A third case the government has cited, *Fischer v. Department of Transportation,* 430 F.Supp. 1349 (D.Mass.1977), *mod. on other grounds sub nom. Fischer v. Adams,* 572 F.2d 406 (1st Cir. 1978), involved a claim for prejudgment interest on a back-pay award in a Title VII action. In this case, the Administrator was of course not sued in a matter related to home-loan guarantees.

For the above reasons the doctrine of sovereign immunity does not bar the award of interest on sums recoverable from the Administrator on home-loan mortgages the VA has guaranteed and accordingly the judgment will include such interest.